THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS CARDENAS, Defendant-Appellant.

First District (3rd Division) Nos. 1—87—2812, 1—88—0528 cons.

Opinion filed January 16, 1991.

218

Martin Carlson, Michael J. Pelletier, and Pamela O'Shea, all of State Appellate Defender's Office, and Jane B. McCullough, of Winston & Strawn, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Inge Fryklund and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

This is a consolidated appeal from two separate convictions by defendant Dennis Cardenas. In case number 1—87—2812 defendant was convicted of the aggravated criminal sexual assault of C.R., receiving a prison term of natural life pursuant to the Habitual Criminal Act (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1). In case number 1—88—0528, defendant was convicted of the residential burglary of the home of J.C., receiving a 15-year prison term for that offense, to be served consecutively to the natural life term.

We have consolidated these cases because they both involve identical issues concerning the propriety of defendant's arrest and subsequent interrogation. Defendant's arrest in the residential burglary case resulted in evidence and statements relating to both cases. In the latter case defense counsel moved to quash defendant's arrest and to suppress evidence, including certain statements allegedly made by him. When it was determined that these identical issues had been raised in case number 1—87—2812, defense counsel withdrew the mo-

tions but sought to preserve for appeal the issue of whether those motions had been properly denied in the earlier trial. On appeal in 1—88—0528, defendant's only contentions of error concern the trial court's rulings on those motions in the earlier trial. In 1—87—2812 defendant also raises those issues. However, he additionally contends: the trial court should have suppressed certain identification testimony; his guilt was not proven beyond a reasonable doubt; his trial attorney's failure to investigate defenses and interview witnesses denied him the effective assistance of counsel; the trial court erroneously overruled defendant's objection to a hypothetical question; the court erroneously refused to give some of defendant's jury instructions; prejudicial final argument by the prosecution deprived defendant of a fair trial; and defendant was improperly sentenced to a term of natural life.

We first consider defendant's contention that the trial court erred in suppressing his motions to quash his arrest and to suppress evidence arising from that arrest. As we have noted, this argument relates to both cases before us, as defendant's arrest for the burglary of J.C.'s home yielded evidence and statements concerning both cases. The evidence concerning this issue can be summarized as follows. On June 29, 1986, at 4 a.m. Chicago police detectives Schnoor and Atkins went to the scene a reported burglary in progress at 1451 West Melrose in Chicago. Schnoor testified that they were told by J.C. that she had been sleeping on the couch and was awakened by a male intruder. The man fumbled with his pants and asked the victim to help him. He then began fondling his penis while telling the victim to "come and get some of this." When the victim yelled to her roommate for help the man grabbed her money off a table and fled through the front door. J.C. described this man as white, 30 to 35 years old, 180 pounds, 5 feet 11 inches, wearing navy pants, a gray top, and a towel over his head. Two doors in the home were unlocked and there was no sign of forced entry.

Schnoor had already been informed by another detective, Mette, of what the police believed to be a pattern of similar crimes in the area. Schnoor testified that in these crimes women were sexually assaulted and their money taken in the early morning after being awakened by a male intruder who had entered through an unlocked door or window. The assailant was described as being a white man, 5 feet 8 inches to 5 feet 10 inches, weighing between 150 and 180 pounds, wearing a hooded sweatshirt or a towel over his head. Some descriptions were of a man between the ages of 25 and 30. Two of the offenses had occurred in the immediate area, six and eight blocks away,

and five days earlier and one month earlier. Defendant was a suspect in these crimes. The pattern began one week after he moved to 1116 North Wood, in November 1985.

Detective Robert Mette was the officer who arrested the defendant. On June 29, 1986, at about 5:30 a.m. he spoke to Detective Schnoor and learned the details of the offense at J.C.'s home. Mette was aware that defendant had been involved in a similar crime pattern of burglaries and rapes in 1977, which Mette had investigated. For those offenses the police had a description of a male white, 25 to 35 years of age, 5 feet 7 inches to 5 feet 11 inches, 140 to 180 pounds, wearing a hood or a towel draped over his head. The victims were normally asleep when the offender entered through an open door or window between midnight and 6 a.m. This pattern ceased after defendant Cardenas was arrested. He was subsequently convicted and imprisoned for a number of those offenses. Within several weeks of his release from prison on November 8, 1985, a similar crime pattern began again. In 1977 the defendant had worked as a pizza delivery man. He was so employed again at the time of his arrest in 1986. Detective Mette testified that this occupation enabled defendant to be in the areas where these crimes occurred.

After learning of the offense at the home of J.C., Detective Mette and his partner drove to the vicinity of defendant's home at 1116 North Wood. When Mette saw the defendant driving, he pulled him over. As Mette approached defendant's car, he saw defendant reach back to the floor behind the driver's seat. Mette asked defendant for his driver's license, and defendant got out of the car and produced his license. In the vehicle Mette could see a white towel on the floor behind the driver's seat and a gray sweatshirt on the back seat. The defendant, who appeared to have an erection, was wearing a blue T-shirt and navy blue pants. Defendant was approximately 5 feet 10 inches, 185 pounds, and appeared to be about 35 to 40 years of age. Detective Mette believed defendant fit the description of the offender in the J.C. crime, and he arrested the defendant at that time.

Defendant testified that at the time of his arrest he was driving home from a date with a woman named Roberta, whose last name he did not know. He was pulled over by an unmarked police car. Two police officers approached and asked him to step out of the car. When he complied they spread him across the front of their car, emptied his pockets, and took his driver's license from his wallet. One of the officers asked him what he had placed on the floor when he pulled over. While one officer kept him by the car, the other officer searched his car and retrieved a towel from the back seat. Defendant denied that

he had a gray sweatshirt in the car. He stated that the gray sweatshirt he was wearing in a lineup photograph taken the next day had been retrieved from his home by the police. After the towel was found, defendant was told he was under arrest on suspicion of burglary and was taken in handcuffs to the police station. Defendant, who was 43 years old, testified that he was 5 feet 11 inches and weighed a little less than 185 pounds at the time of his arrest. At that time he was wearing navy blue slacks and a blue Bears T-shirt.

■ After hearing argument on this evidence, the trial court ruled that the officers had at least a reasonable suspicion justifying a *Terry* stop when they first pulled the defendant over. They then had probable cause to arrest the defendant after they saw the towel and gray sweatshirt in defendant's car. Accordingly, the court found no basis for quashing defendant's arrest. We find no merit to defendant's contention that this ruling should be overturned. Under the standards enunciated in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, police officers may temporarily detain an individual provided that the officers have a reasonable suspicion, based upon specific and articulable facts, that criminal activity is afoot. Illinois has codified that standard, providing that a police officer may "stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense." (Ill. Rev. Stat. 1985, ch. 38, par. 107—14.) In this cause there were numerous facts known to the officers which justified them in believing that the defendant had recently committed an offense. They knew that the defendant had previously been convicted of a series of early morning burglaries and rapes in which entry had been via an open door or window, the victim was initially asleep, and the offender was wearing a hood or towel on his head. The offender then was described as a male, white, 25 to 35, 5 feet 7 inches to 5 feet 11 inches, 140 to 180 pounds. They knew that this pattern had ceased when defendant was arrested and imprisoned, and that the same pattern arose again several weeks after defendant was paroled and again obtained employment delivering pizzas in the area. The offender was described as a male white, 5 feet 8 inches to 5 feet 10 inches, weighing 150 to 180 pounds, with a hooded sweatshirt or towel over his head. The women were usually sleeping when first accosted, and they were sexually assaulted and deprived of money. In the crime which had occurred shortly before the defendant was stopped, the offender was described as a male white, 30 to 35 years of age, 5 feet 11 inches, 180 pounds, wearing navy pants, a gray top, and a towel over his head. Entry was apparently

made through an open door. The offender sought to involve the victim in sexual activity, and he took money before fleeing.

■ Detective Mette had been involved in the investigation of defendant's crimes in 1977. He knew the defendant and recognized him in his car in the early morning hours of June 29, 1986, shortly after the commission of the offense Mette was investigating. Police testimony established that at this time defendant was already a suspect in the recent crime pattern. Clearly Detective Mette had an articulable basis for a reasonable suspicion that defendant was the man who had just accosted J.C. When the officer approached defendant's vehicle and asked him for identification, he then was able to observe the towel which defendant had apparently just attempted to hide as well as a gray sweatshirt. Defendant appeared to the officer to be approximately 5 feet 10 inches, 185, and between 35 and 40 years of age. He was wearing blue pants, and the towel and sweatshirt matched the description given by the victim. Detective Mette was not then operating under a mere hunch, as defendant contends. Detective Mette now had a reasonable basis for believing that defendant had committed the offenses against J.C., and therefore he had probable cause to arrest him. *People v. Fetterman* (1973), 14 Ill. App. 3d 120, 302 N.E.2d 218.

We also find no merit to defendant's contention, raised in both cases before us, that incriminating statements made by him during interrogation following this arrest should have been suppressed as involuntary. The State's evidence concerning that interrogation was as follows. Following the defendant's arrest at 6 a.m. on June 29, he was taken to Area 6 headquarters, where Detective Mette advised him of his *Miranda* rights and questioned him for 15 minutes. Defendant was next questioned at 1 p.m. by Detective Scott Keenan, in the presence of Detective McDermitt. Defendant was advised of his rights and agreed to talk to the detectives. Keenan told defendant he had been identified in a lineup as the perpetrator of the burglary of J.C. In an ensuing 45-minute conversation, defendant confessed to that offense. Keenan returned between 2:30 and 3 p.m. and took a written statement concerning the burglary. He also had a short conversation with defendant at 4 p.m. Prior to each of those conversations he advised defendant of his rights.

At 4:30 p.m. Detective Barry Moran advised defendant of his rights and then questioned him for 30 to 40 minutes. Moran then left the room, spoke to defendant's mother, and returned with her. Defendant's mother told him to tell the truth. Defendant then made a number of incriminating statements about certain crimes committed

by him, including a statement concerning the offense involving C.R. At 6:30 p.m. Detective Krull, after speaking with Detective Moran, advised defendant of his rights and questioned him for 15 minutes. Krull testified that at this time the defendant was not handcuffed.

At about 8 p.m. Krull and two other detectives took defendant to his bond hearing. Defendant then directed them to several locations in the city. At about 9 p.m. they bought him some food at a hot dog stand. Defendant was then returned to Area 6 where, at 11:30 p.m., he was questioned by Assistant State's Attorney Timothy Frenzer. Frenzer testified that he identified himself and then advised defendant of his rights. He then obtained a statement from defendant. Frenzer testified that defendant spoke in a normal conversational tone and was alert and responsive. Defendant did not appear tired, he did not yawn, and he never asked to stop the questioning so he could sleep. Defendant was not handcuffed during this questioning. At about midnight defendant signed a written statement, after first making a number of corrections as Frenzer prepared it. Defendant was taken down to the lock-up for the night at about 1:15 p.m.

The next morning, June 30, at 9 a.m. Detective Moran checked defendant out of the lock-up and got him some food that defendant's mother had brought for him the night before. Defendant appeared to Moran to have just woken up. Detective Keenan, who then questioned the defendant, testified that defendant appeared to be alert and responsive and never yawned in his presence.

At 3 p.m. defendant was questioned by Assistant State's Attorney Jane Liechty. She advised him of her office and gave him his rights. Defendant was not handcuffed during the 15 minutes that she questioned him. At about 4:15 p.m., in the presence of Detectives Keenan and Ryan, she obtained three written statements from defendant, including a statement concerning defendant's attack on C.R. Liechty testified that defendant was awake and responsive to questions. He never complained that he had not been allowed to sleep; indeed, he told her that he had been allowed to sleep at the police station. He also told her that he had been given food, drink, and an opportunity to use the washroom. Defendant stated that he had not been threatened.

Detective Keenan testified that he did not believe defendant was ever handcuffed during any of Keenan's sessions with him. He was free to move around and was awake and alert at those times. Keenan denied ever having told the defendant that he would die in Stateville.

In his testimony defendant contended that sleep deprivation was a major factor in his interrogations. He claimed that at the time of his

arrest on Sunday morning he was exhausted, as he had not slept since Friday night, when he had slept five hours. During his first day of interrogation he had asked a number of officers, including Detectives Moran and Keenan, to be allowed to sleep. He also told the two assistant State's Attorneys who questioned him that he had not had enough sleep and that he needed to sleep. However, his first opportunity to sleep was when he was placed in the lock-up early Monday morning.

Defendant denied that he had been advised of his rights by any of the officers who questioned him. However, he admitted that he had been advised of those rights by the first assistant State's Attorney who questioned him. He also stated that he knew what *Miranda* warnings were and understood those rights. Defendant also denied signing any of the written statements he allegedly gave. When shown the five statements purporting to bear his signature, he denied that the signatures were his.

Defendant's mother testified that at noon on Sunday, June 29, she first went to the police station, bringing defendant his gray sweatshirt. She returned to the station at 3 p.m., but did not see her son until 5 p.m. At that time he was seated in a small room, with his hands handcuffed above his shoulders. He looked as if he were drunk or incoherent and appeared tired. After 20 minutes alone with the defendant, she was joined by Lieutenant Jurkowski and Detective Moran. Defendant's mother testified that she pleaded with defendant to tell the police whatever they wanted to hear. Defendant was in tears and then began to talk to them. At about 7:30 or 8:30 p.m. she was permitted to bring him something to eat.

In rebuttal Lieutenant Jurkowski testified that he had never spoken to the defendant or defendant's mother on June 29 or June 30. Sergeant James Biebel testified that he had been in and out of the room where defendant was being questioned at the time testified to by defendant's mother. Defendant did not ask to get any sleep. Detective Krull, who questioned the defendant after Detective Moran, had previously testified that the defendant was not then handcuffed.

Following arguments by counsel concerning this testimony, the trial court made its ruling. The court noted that the credibility of witnesses was an important factor in the deliberations. The court specifically found that defendant was advised of his *Miranda* rights when he was first brought to the police station and repeatedly thereafter. The court found that defendant had not been threatened. Concerning the issues of defendant's lack of sleep and the extensive interrogation, the court found:

"[T]here's no question that the defendant on the 29th was subjected to extensive interrogation. He was arrested around 6 a.m. in the morning and it was 1:30 the next morning by the State's own testimony that he was taken to the lockup to retire. Placing the circumstances that an entire day of context [sic] and affording the credibility of the State's witnesses that I think is due, it was indeed a long day, but I don't believe that the deprivation of sleep were [sic] inherent in the activities of that day. *** I find nothing in the circumstances of the 30th that suggests any kind of coercive force which would produce an involuntary statement. Accordingly the motion to suppress statements is denied."

 █ We find no basis for overturning this determination by the trial court. It is the totality of the circumstances which determines whether a statement was voluntarily given. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) Defendant correctly states that deprivation of sleep is a factor to be considered by the court. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) But in this cause the trial court, like the court in *Pittman*, considered that factor and found it to not be dispositive. As our summary of the evidence has established, there was ample testimony from those questioning defendant which established that he was alert, responsive, and showed no signs of sleepiness while being questioned. The testimony of defendant's mother concerning the questioning that she witnessed was impeached in many respects. Defendant himself did not testify that he was handcuffed at the time of this questioning. Detective Krull, who questioned defendant immediately after the questioning by Detective Moran, testified that defendant was not then handcuffed. Detective Moran testified that defendant's mother only advised defendant to tell the truth. We do not find this to be the "psychological pressure" which defendant claims it to have been. Indeed, defendant's mother testified that she was allowed to speak with him alone for 20 minutes before that questioning session began.

This defendant was 43 years old, with extensive prior experience with the criminal justice system, at the time he was questioned. He testified at trial that he was familiar with the *Miranda* warnings and understood them. The trial court expressly found that he had been advised of these rights prior to any questioning and repeatedly thereafter. Taking into consideration all of these factors, we cannot find that the trial court's determination of voluntariness was contrary to the manifest weight of the evidence and, accordingly, we will not disturb

that finding. *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 501 N.E.2d 207.

Defendant's remaining contentions concern only his conviction in No. 1—87—2812 for the aggravated criminal sexual assault of C.R. Defendant contends that the trial court should have suppressed the lineup identification of him made by C.R. Detective Krull testified that he conducted this lineup at 3:15 p.m. on June 30. Appearing in the lineup with the defendant were four police detectives. According to Krull, C.R. had described her attacker as a male white, approximately 5 feet 8 inches to 5 feet 10 inches, weighing 160 to 180 pounds. All of the people in the lineup were between 5 feet 8 inches and 5 feet 10 inches. Two of the men had moustaches, although C.R. had not described her attacker as having a moustache. However, Krull also testified that defendant and the other lineup participants all had a 5 o'clock shadow or some sort of facial hair. It was Krull's belief that all of the people in the lineup were approximately the same age as the defendant and that they all appeared to be in approximately the same weight group.

■ Defendant contends that he was entitled to an attorney at this lineup and that he should have been advised of this right. But defendant possessed no constitutional right to counsel at this pre-indictment lineup where formal adversary proceedings had not been commenced by means of a formal charge, preliminary hearing, indictment, information, or arraignment. *People v. Logan* (1983), 117 Ill. App. 3d 753, 453 N.E.2d 1317.

■ We also find no merit to defendant's contention that this lineup was unduly suggestive. A photograph of that lineup is contained in the record before us. It clearly supports the testimony of Detective Krull concerning the basic similarity in height, weight, and age of all the participants. Defendant complains that two of the participants had moustaches and that one had gray hair. He also contends that three of the officers wore white dress shirts whereas defendant was dressed in a T-shirt and sweatshirt jacket. Certainly there is no requirement that the participants in a lineup be identical, and minor differences in appearance are not critical. (See *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644.) On this record we find that the trial court was correct in determining that this lineup was not unduly suggestive.

We next consider defendant's contention that his guilt was not established beyond a reasonable doubt. At trial C.R. testified that the evening of June 25, 1986, she had fallen asleep in her home with the television on. Between midnight and 1 a.m. she was awakened by a

man standing over her bed. She subsequently identified this man as the defendant in a lineup and at trial. The defendant struck her and subsequently grabbed her by the hair, at which point she bit him in the left forearm. The defendant then forced her to have sexual intercourse with him. After this he wiped himself off with a shawl and told the victim he was going to leave and not to move for a few minutes. He then left through the kitchen door. C.R. got up and locked the storm door and window as well as the screen door. She went into the bathroom, urinated, and washed the lower part of her body. She then applied ice to her cut lip and cried herself to sleep. C.R.'s roommate testified that the next morning she came home to find C.R. with a bruise on the side of her face and swollen, bloodshot eyes. C.R. told her that she had been raped, and the police were summoned and C.R. was taken to the hospital.

C.R. described her assailant to the police as a white male in his late twenties, of average height, and weight, with very dark brown eyes, a dark complexion, and dark hairy arms. Her assailant was wearing a hood so she could not see his entire face. However, she could see the part of his face around his eyebrows, his eyes, and his nose. She could also see that he had no moustache and that his eyebrows were very dark. Defendant was in the apartment for 30 to 45 minutes. She was within two to three feet of his face for about 25 minutes. She testified that although she ordinarily wore glasses and was not wearing them when attacked, the glasses were for nearsightedness and she did not have problems seeing the defendant.

When the defendant was arrested, a hooded sweatshirt was found in his car. The police also observed a small arc-like scar on his left arm. Detective Moran testified that on June 29, the day of his arrest, defendant told him that several days earlier, between 1 and 2 a.m. he had raped a woman in the area of Cicero and Belmont. Defendant stated that he entered the woman's apartment through an open back door and saw her sleeping in bed. He turned her television off, grabbed the woman, and forced her to have sex with him. Later that evening defendant took the police to the location of C.R.'s apartment, where he said the rape took place. Only later did Detective Moran learn that C.R. had been attacked at that location. Assistant State's Attorney Liechty also testified that defendant subsequently signed a written confession to this offense. Defendant told her that the woman he attacked had bitten his left forearm.

Defendant's mother testified that on the evening in question, from midnight until 3 a.m., her son was with her watching video tapes. The defense also presented the testimony of a police criminologist. She

testified that she had examined a blanket in which C.R. had wrapped herself when taken to the hospital. C.R. had previously testified that she was seated on this blanket for 15 minutes at the hospital prior to her examination. The criminologist testified that a semen stain found on that blanket was inconsistent with defendant's blood type. No semen activity was found in vaginal swabs taken from C.R. nor was any found in her panties. In rebuttal, C.R.'s roommate testified that the blanket for C.R. had been obtained from the roommate's room. The blanket had been on the roommate's bed, on which the roommate had had intercourse numerous times. The blanket had not been washed in that period.

■ Clearly this evidence sufficed to establish defendant's guilt beyond a reasonable doubt. His victim identified him in a lineup and in court. Her testimony was corroborated by a prompt outcry, by physical injuries, and by the bitemark observed on the defendant's arm. Defendant raises a number of points which in our view only presented questions for the jury as the finder of fact to resolve. He points out that a police detective's notes showed that C.R. told him she had bitten the defendant's right arm, whereas she testified that it was the left arm. But that detective testified that he had no independent recollection of what she had told him, and several witnesses testified to the mark observed on defendant's left arm. Defendant notes that the semen found on the blanket was established not to be his. But C.R.'s roommate's testimony established an alternative source for that semen. The criminologist also testified that the absence of any other semen could have been explained by defendant's failure to ejaculate, a fact which was neither proven nor disproven at trial. Defendant cites to his mother's alibi testimony, but the jury was not required to accept this alibi testimony in the face of the victim's identification testimony. *People v. Du Pree* (1987), 161 Ill. App. 3d 951, 514 N.E.2d 583.

■ Defendant raises a number of contentions concerning the victim's identification, including her limited ability to observe her assailant during the attack and her description of a man in his late twenties when the defendant was 43. Again, these merely presented discrepancies to be resolved by the jurors as the finders of fact. We do not find that any of these factors sufficed to raise a reasonable doubt of defendant's guilt. Finally, defendant cites to alleged discrepancies in the defendant's signed confession, such as his reference to the crime occurring after midnight on June 26. In fact the crime did occur after midnight, which made it June 26. In most respects defendant's confessions tracked his victim's account quite closely. The minor discrepancies raised by the defendant were properly resolved by the

jury. A reviewing court will reverse a conviction based upon reasonable doubt only where no rational trier of fact, viewing all of the evidence in the light most favorable to the prosecution, could have found all of the elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) In this cause we find no such basis for reversing defendant's conviction.

We next consider defendant's contention that his attorney's failure to investigate certain matters deprived him of the effective assistance of counsel. Defendant specifically contends that his attorney failed to pursue his claim that the signatures on his confessions were forged, as well as his contention that the mark on his arm was caused by a burn. At the hearing on defendant's motion for a new trial, testimony was heard concerning these allegations. At that hearing, the defendant testified that he had repeatedly told his trial attorney that the signatures were not his and he had asked him to obtain additional handwriting samples and to make comparisons of his signature. Defendant's trial attorney testified that defendant initially told him he could not recall whether or not he had signed the statements. Counsel also testified that his viewing of the signatures persuaded him that obtaining the testimony of a handwriting expert would be of no utility. He also testified that such a defense would have required a theory involving a massive police conspiracy, and his opinion was that a defense of police coercion would be more viable.

Defendant also testified at the hearing that he had asked his counsel to verify that the mark on his arm was a burn by interviewing co-workers at the store where the burn occurred and by obtaining a professional opinion of a photograph of the mark. Defendant claimed to have given his counsel the first name of the store manager, the store's address, and the names of two other store employees. Defense counsel testified that when he viewed the photograph he believed it could depict a bite mark, as the mark consisted of a series of small and slightly separated red marks in a crescent shape. He also testified that the defendant failed to furnish him with the names of witnesses to the burn, even though he repeatedly asked defendant for them. At the conclusion of this testimony, the trial court denied defendant's motion, indicating that it believed defendant's counsel. We find no basis for overturning that determination.

Defendant also contends that he was denied a fair trial when the trial court allowed the prosecution to ask the police criminologist a hypothetical question that was based upon a fact not in evidence. The question related to the evidence that no semen attributable to the defendant was found on the blanket worn by the victim at the hospi-

tal. Over defense objection, the prosecution elicited from the witness testimony that there would be no "semen activity" on the blanket assuming the person wrapped in the blanket was also wearing panties. Defendant contends that there was no evidence that the victim was wearing panties at the hospital. But in fact the victim had testified that at the hospital she was wearing an undergarment which was subsequently taken by the police. Furthermore, in rebuttal testimony the victim's roommate specifically testified that the victim was wearing panties when she went to the hospital. Accordingly, we find no error in the trial court's ruling on this question. See *People v. McCumber* (1985), 132 Ill. App. 3d 339, 477 N.E.2d 525.

■ Defendant contends that there were several trial errors involving jury deliberations. He first contends that the trial court erred in refusing to tender to the jury four instructions concerning the issue of identification. The trial court's refusal of these instructions is supported by IPI Criminal 2d No. 3.15 (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (2d ed. 1981)), which recommends that no instructions be given on this issue as it is adequately covered by the general instruction on credibility of witnesses. That latter instruction, IPI Criminal 2d No. 1.02 (Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1985)), was given. We accordingly find no merit to this contention. *People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720.

■ Defendant also complains of improper final argument by the prosecution. Two comments are at issue, both occurring in rebuttal argument by the prosecutor. Defense counsel had told the jury that they should not be affected by emotions and by the outrage they had heard in the victim's voice. The prosecutor subsequently told the jury:

> "Ladies and gentlemen, defense counsel has talked about emotions, and outrage. Well, ladies and gentlemen, I am outraged and I suggest to you that you should be outraged too."

The second comment concerned the blanket which defense counsel had argued to the jury helped to exonerate the defendant because the semen stain it bore was not that of the defendant. The prosecutor, over defense objection, argued that defense counsel was attempting to "cover up all the hard facts of this case with the blanket" and further stated that the blanket had nothing to do with the offense. Clearly these comments should not have been made, but given the overwhelming evidence of guilt in this case, we do not find that they could have been a material factor in defendant's conviction and, therefore, we find no reversible error in them. *People v. Kim* (1986), 148 Ill. App. 3d 191, 498 N.E.2d 831.

■ Finally defendant asks that we vacate his sentence to life imprisonment. He contends that the Illinois Habitual Criminal Act (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1) is unconstitutional. The arguments he makes in this regard have previously been rejected by this court, and we find no basis for reconsideration of them. (*People v. Westefer* (1988), 169 Ill. App. 3d 59, 522 N.E.2d 1381; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 501 N.E.2d 781.) Defendant also contends that the State failed to establish that he qualified for sentencing under the Habitual Criminal Act. At the time of defendant's sentencing, the Act required proof of two prior convictions containing "the same elements as an offense now classified in Illinois as a Class X felony." (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1.) The predicate convictions in defendant's case were a 1966 rape conviction and convictions in 1978 for rape and deviate sexual assault. Defendant contends that these convictions did not suffice because, under a 1984 amendment, those offenses were reclassified as criminal sexual assault, which is not a Class X felony. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—13(a)(1), (b).) This argument, too, has been considered and rejected by this court. (*People v. Sims* (1987), 166 Ill. App. 3d 289, 519 N.E.2d 921.) Accordingly, we affirm defendant's sentence.

For the reasons set forth in this opinion, we affirm defendant's convictions and sentences in these consolidated appeals.

Affirmed.

RIZZI and FREEMAN,* JJ., concur.

---

*Justice Freeman participated in the decision of this case prior to taking office as a supreme court justice.