THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CALVIN JOHNSON, Defendant-Appellant.

First District (6th Division)   No. 1—89—3460

Opinion filed November 15, 1991.

2

Michael J. Pelletier, of State Appellate Defender's Office, and Sidley & Austin, both of Chicago (John M. George, Jr., and Brooke A. Adams, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Susan Elias, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant was charged with the robbery of a person over the age of 60. Defendant's first trial ended in a mistrial when the jury was unable to reach a unanimous verdict. Following a second jury trial, defendant was found guilty as charged and was sentenced to a term of seven years. The issues raised on appeal are: (1) whether the trial court erred in admitting testimony regarding the out-of-court and in-court identifications of defendant; (2) whether the State failed to prove defendant guilty of robbery beyond a reasonable doubt; (3) whether defendant's right to due process was violated when the State allegedly withheld evidence regarding an alibi witness' presence with defendant at the time of the robbery; and (4) whether defendant's right to an impartial trial was violated by the State's questions and comments regarding other unrelated criminal activity at the location where defendant was arrested.

At the second trial, the complainant, Edwin Blackwell testified that on the afternoon of December 31, 1988, he and his wife, Mildred Blackwell, drove to the Church of Good Shepherd at 57th Street and Prairie to deliver flowers. The complainant parked his car across the street about 30 feet from the side entrance of the church and walked to the church door while his wife remained in the car. As he approached the church, the complainant saw two men coming down 57th Street in his direction. One of the men, later identified as the defendant, came up to the complainant and put his hands on him, pretending to know him. At that time the complainant was about two feet away from the man and was facing him. The complainant had both hands in his pockets, one of which contained the complainant's wallet with $62 in it. Defendant proceeded to turn the complainant around, and as he did, the complainant's hands came out of his pockets. Defendant then took the complainant's wallet and fled. The complainant stated that about 8 to 10 seconds elapsed from the time that defendant put his hands on him until the time that he ran off with his billfold. The police were subsequently contacted, and when they arrived, the complainant gave them a description of defendant. The complainant testified that he described defendant to the police as a man with a dark complexion who was 5 feet 8 or 9 inches tall and weighed about 170 or 175 pounds. The complainant also stated that he described defendant's clothing as a red baseball cap, a tan jacket and red pants. Later that evening the complainant went to the police station where he identified defendant in a lineup as the man who had robbed him. At

the trial the complainant identified defendant as the man who robbed him, and when he was shown a photograph of the lineup, he stated that it was the lineup that he had viewed on the night of the robbery. He also identified defendant in the photograph as the man he had identified to the police when he first viewed the lineup. The complainant stated that the red pants defendant was wearing in the picture were the same pants he was wearing at the time of the robbery but that the jacket he had on was not the same jacket worn during the robbery. The complainant also identified defendant from a separate photograph taken at the time of the lineup.

At the first trial, defense counsel, on cross-examination, had asked the complainant if he had mentioned anything to the police about the presence of facial hair. The complainant responded that at the time of the robbery defendant did not have a beard or a mustache. On cross-examination at the second trial, the complainant stated that he did not recall if defendant had a beard or a mustache at the time of the robbery. When questioned about his prior testimony he stated that he did not remember making the statement. He also stated that he did not remember telling the police at the time of the incident that defendant was 5 feet 7 inches as opposed to 5 feet 8 or 9 inches and that he weighed 160 pounds rather than 170 to 175 pounds.

The complainant's wife, Mildred Blackwell, testified that on the day of the incident she had gone with her husband to the church to deliver flowers. She remained in the car, which was parked about 20 to 30 feet from the church on the other side of the street. Shortly before her husband was robbed, she saw the man she later identified as defendant approach her husband. She further testified that she saw him turn her husband around and take his billfold from his pocket. Defendant then ran west on 57th Street into an alley. When the police arrived, Mrs. Blackwell told them that the man who robbed her husband was wearing red jogging pants, a red cap and a brown or beige leather jacket. At the lineup which Mrs. Blackwell viewed that evening, she identified defendant as the man who had robbed her husband. At the second trial, Mrs. Blackwell also identified defendant as the man who had committed the robbery. She then identified a photograph of a lineup as the one she viewed on the night of the robbery and defendant as the man she had identified to the police. She further testified that defendant was wearing a different jacket in the lineup than the one he wore at the time of the robbery and that he was not wearing the cap he wore at that time.

On cross-examination, Mrs. Blackwell stated that she was positive of her identification of defendant as the man who had robbed her husband, and on redirect examination, she stated that her identification of defendant was not only based on the clothing he was wearing but also on the fact that he looked like the man who robbed her husband. When asked if defendant had a beard or a mustache on the night of the incident, Mrs. Blackwell stated that she could not see if he had a mustache but that he did not have a beard.

Officer Joe Parker testified that he first learned of the robbery when he received a radio communication to see an elderly couple at 57th Street and Prairie. Parker spoke with the complainant and his wife as well as a woman who lived in the neighborhood. As a result of this conversation, Parker and his partner went to an apartment at 5714 South Prairie and knocked on the door. One of the men in the apartment came to the window with a gun, saw the two officers and said "It's the police." He then ran past the rear door, which was propped up with a two by four, and kicked it down. After he kicked it down, the door swung open. The officers entered the apartment and followed the man into the living room, where they saw numerous people including defendant. At that time defendant was wearing gym shoes, red pants and cap and a tan jacket. When defendant saw the officers, he ran into the rear bedroom and barricaded the door with a chest of drawers. The officers forcibly entered the bedroom and saw defendant in the process of removing his jeans, cap and jacket. They also found a woman in the room with defendant. Defendant was told to get dressed, and he was placed under arrest. The other occupants of the apartment were also arrested at that time. In addition, drugs and drug paraphernalia were found on the premises. Parker also testified that the arrest reports on all of the occupants of the apartment were completed that night.

After defendant was arrested and brought to the police station, the complainant and Mrs. Blackwell were contacted to view a lineup. Parker testified that when he went to help Detective George Tracy organize the lineup, he found that defendant had changed his clothes and was wearing dark jeans and jacket and no cap. He ordered defendant's clothing retrieved but only the red pants were found, which defendant was told to put back on. He was thus viewed in the lineup with his own pants, no shirt and a jacket he had obtained in the lock-up. Parker stated that during the lineup all of the participants were seated.

On cross-examination, Parker stated that when the complainant and Mrs. Blackwell described defendant to him they reported that his

height was 5 feet 7 inches and that his weight was 160 pounds. When questioned by defense counsel, Parker stated that the complainant and Mrs. Blackwell reported that, although defendant was first seen coming down the street with another man, only defendant committed the robbery. Defense counsel then showed him a copy of his report, which contained the statement that both men were involved in the robbery and that one man held defendant while the other one robbed him. Parker replied that even though he signed the report, his partner was the one who prepared it.

Detective George Tracy testified that the complainant and his wife separately viewed the lineup and identified defendant as the man who had committed the robbery. He added that Mrs. Blackwell said that defendant was dressed and looked like the man who had robbed her husband. When asked about an entry in his report at the time of the lineup that Mrs. Blackwell was not positive about her identification, he stated that her statement that defendant looked like the man who had robbed her husband was not considered a positive identification but that she showed no hesitancy when she identified defendant.

Diane Mosley testified on defendant's behalf that on December 31, 1988, she and defendant went to the house of one of his friends when defendant had a disagreement with her mother. She stated that she was with him from 4 a.m. on the day of the robbery until the police arrived at around 4:30 that afternoon.

On cross-examination, Mosley stated that she was asleep when the police entered the room, and she was not trying to undress. She also testified that the door to the bedroom had not been barricaded. Mosley stated that when the police arrested her and everyone else in the apartment, she did not give them her real name, but she could not remember what name she used. She further testified that she did not see any drugs in the apartment. In response to the State's questioning, Mosley acknowledged that she did not inform the police that defendant had been with her when she learned that he was charged with the robbery.

Defendant testified that he and Diane Mosley arrived at his friend's house at around 4 a.m. on the day of the robbery and that they remained in bed until the police arrived that afternoon. He denied having a red cap or tan jacket. Defendant also added that the police kicked the bedroom door open and denied that it was barricaded by furniture. The police told him to get dressed but would not permit him to put on a black shirt that he had worn over to the apartment. Finally, defendant denied knowing or robbing the complainant.

On cross-examination, defendant stated that he did not try to change his clothes when he was at the station and that the jacket he wore in the lineup was his own jacket. According to defendant, Detective Tracy did not advise him of his *Miranda* rights, or ask him any questions about where he had been on the day of the robbery or the previous night.

In rebuttal, Officer Parker identified the 11 arrest reports as the reports of everyone arrested at the apartment at 5714 South Prairie on the day of the robbery. He also stated that everyone at the apartment, which included six females and five males, was arrested. Each report contained the name, address and description of the person. Parker added that a woman other than Mosley was with defendant when he was arrested.

Detective Tracy testified in rebuttal that after the lineup he advised defendant of his *Miranda* rights and questioned him about the robbery. He then testified that defendant told him that he had been at the apartment at 5714 South Prairie since 3 p.m. on December 31, 1988, and that he did not mention being with Mosley since 4 a.m. that morning.

Defendant contends that the admission of testimony regarding the out-of-court and in-court identification of him was improper because it was based on a suggestive pretrial lineup. Although defendant has raised this issue on appeal, he failed to object to the admission of this testimony at the trial or raise the issue in his motion for a new trial. Under these circumstances, an issue is usually waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) However, "a reviewing court can consider matters not argued below if the matter could result in substantial prejudice to defendant's rights." (*People v. Redmond* (1980), 85 Ill. App. 3d 599, 604, 407 N.E.2d 132.) Because the alleged error in this case is one which would affect defendant's right to due process, we will consider this issue even though it was not properly preserved for review. See Supreme Court Rule 615(a) (134 Ill. 2d 615(a)); *People v. Weinstein* (1966), 35 Ill. 2d 467, 471, 220 N.E.2d 432.

Defendant claims that the lineup was suggestive because he was the only one wearing red trousers similar to those worn by the robber. We disagree. The lineup in question was composed of five men who appeared to be of similar age, weight and height although they were viewed in a sitting position. Several men in addition to defendant were black, and they all wore casual or informal clothing. Although defendant was the only one with red trousers, " 'any complaint that there were differences between the appearance of

defendant and the other lineup participants goes to the weight of the evidence, rather than to its admissibility.' " (*People v. Trass* (1985), 136 Ill. App. 3d 455, 463, 483 N.E.2d 564, quoting *People v. Philson* (1979), 71 Ill. App. 3d 513, 520, 389 N.E.2d 1223.) Furthermore, there is no requirement that the participants in a lineup be identical. (*People v. Cardenas* (1991), 209 Ill. App. 3d 217, 227, 568 N.E.2d 102.) In this case, defendant was wearing red pants when arrested, and there was certainly no requirement that the police find red pants for everyone in the lineup. Furthermore, the photograph of the lineup contained in the record shows that all the participants including defendant were basically similar in appearance.

Although defendant relies on *People v. Franklin* (1974), 22 Ill. App. 3d 775, 317 N.E.2d 611, we find it factually distinguishable. In *Franklin*, although the police found clothing in defendant's apartment that matched the description of clothing worn by the robber, defendant was not wearing the clothing when the police came to his apartment, and he selected other clothes to wear to the police station when the police arrested him. However, prior to the lineup, the police forced defendant to change from the clothes he was wearing to the trousers and coat that had been implicated in the robbery. In addition, when one of the witnesses viewing the lineup tentatively identified the defendant commenting that his hair looked different, the police had defendant put on the afro wig that was allegedly worn by the same person who wore the coat and trousers. The clothing worn by the defendant in *Franklin*, which consisted of shocking pink pants, a camel hair coat with a fur collar and an afro wig, was also more distinct than the red trousers worn by defendant in this case. In this case, defendant was either wearing red pants or selected them to wear to the station when the police arrested him. Even though the police would not allow him to wear someone else's trousers to the lineup, he was allowed to appear without the jacket and cap he had worn to the station, which were also allegedly part of the robber's attire. Thus, the police in this case did not take the same measures as in *Franklin* to promote identification of the defendant as the offender. For these reasons, we conclude that the lineup in which defendant was identified as the man who robbed the complainant was not unduly suggestive. Based on our finding that the lineup was not suggestive, we need not reach the questions of whether under the totality of circumstances the identification was reliable (see *Neil v. Biggers* (1972), 409 U.S. 188, 198, 34 L. Ed. 2d 401, 410-11, 93 S. Ct. 375, 381-82), whether the State established an independent basis for

the in-court identification or whether defense counsel was ineffective in not objecting to the identification testimony.

Defendant next contends that the State failed to prove him guilty of the robbery beyond a reasonable doubt. When an appeals court reviews the sufficiency of evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■ In addition to the witnesses' pretrial and in-court identifications of defendant, there was Officer Parker's testimony that when he and his partner saw defendant shortly after the robbery he was wearing clothing that was purportedly similar to that worn by the man who committed the robbery. Parker also stated that when defendant saw them he ran into another room and tried to barricade the door, but the officers entered the room and found defendant trying to remove his clothes. Detective Tracy and Officer Parker both testified that prior to being viewed in a lineup, defendant tried to exchange his pants and jacket with someone in the detention area. We conclude that this evidence was sufficient for the trier of fact to find defendant guilty beyond a reasonable doubt.

■ Defendant next contends that his right to due process was violated when the State withheld evidence favorable to his defense. The evidence which was allegedly withheld was an arrest report of an alibi witness which would have corroborated his defense. Defendant claimed that he was at a friend's apartment with his girl friend, Diane Mosley, at the time of the robbery. Officer Parker testified that he arrested defendant at this location along with 11 other people who were also in the apartment. According to Parker's testimony, the other occupants were arrested because drugs and drug paraphernalia were found in the apartment. Although defendant claimed that he was with Diane Mosley when the police arrived, there was no arrest report with her name. Mosley testified that she gave the police an alias name but could not remember what it was. Parker saw Mosley at the trial and stated that she was not among the people arrested that night. The arrest report which the officer completed that night contained the entry that 13 people (including defendant) rather than 12 people were arrested. However, in response to defense counsel's request for the arrest reports at issue, only 12 reports were tendered. Defendant argues that the discrepancy between the number of people arrested as indicated in the police officer's report and the number of arrest re-

ports submitted is evidence that the State deliberately withheld the arrest report for Mosley and that this was a violation of his right to due process under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

The suppression of evidence favorable to an accused, upon request, is a violation of due process where the evidence is material to guilt or punishment. (*Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.) To prove a *Brady* violation, a defendant must show that evidence actually existed, that it was in possession of the prosecutor, that it was favorable to the defense and that the prosecutor failed to disclose the evidence in response to a specific request. *People v. Sims* (1987), 166 Ill. App. 3d 289, 310, 519 N.E.2d 921.

In this case, the officer testified he arrested everyone who was in the apartment on the night of the incident and that Diane Mosley was not among them. In addition, the prosecutor told the court that reports of all those arrested were tendered to defense counsel. Although defendant claims that one arrest report was withheld by the State as evidenced by the officer's entry on his written report that 13 people were arrested, he did not cross-examine the officer on the discrepancy in his report and the number of arrest reports tendered to defense counsel. Where defendant has failed to present any evidence that the missing report ever existed, the State cannot be accused of withholding such evidence. (*Sims*, 166 Ill. App. 3d at 310.) Furthermore, the jury heard the conflicting testimony regarding the existence of Mosley's arrest report as well as her presence with defendant on the night of the incident, and they found the State's witnesses more credible. Therefore, defendant's claim that he is entitled to a reversal of his conviction or a new trial based on the State's withholding of evidence is without merit.

Defendant's final contention is that he was denied a fair trial by the prosecutor's questions and comments regarding other irrelevant criminal activity at the place where defendant was arrested. Defendant first argues that the prosecutor elicited testimony from Officer Parker regarding the presence of illegal drugs and a gun in the apartment where defendant was located and also asked about drugs during his cross-examination of defendant and Diane Mosley. Defendant also claims that the prosecutor in closing argument improperly referred to the apartment where defendant was staying as a bordello drug house.

On direct examination, Parker testified that when he knocked on the door of the apartment in question a black male came to an adjacent window carrying a firearm. Parker then stated that when he entered the apartment he first apprehended the man with the firearm,

whom he referred to as Louis Lowell. On redirect examination, Parker testified that he arrested everyone in the apartment because he found drugs and drug paraphernalia on the premises as well as in the occupants' possession. On cross-examination, the prosecutor asked Mosley and defendant if drugs and drug paraphernalia were in the apartment. They both denied the presence of drugs but defendant made the unelicited statement—"I never saw any drugs. I know they was using them." Defendant also initiated several references to the gun as follows:

"Q. Took you directly from lock-up to the lineup.

A. Yes, and didn't tell me nothing. I thought I was arrested for something else.

Q. What was that?

A. Being at wrong place and wrong time.

Q. For Papa?

A. Papa having a gun. They beat him to death almost for having a gun and—

Q. Back up a second. Papa had a gun?

A. They said it was his. I come to find out it wasn't his.

Q. Did you see a gun?

A. Yes I did. The police had it—said someone had it and said it was Papa's because it was his apartment."

In closing argument, the prosecutor made two references to the man with the firearm in the context of describing how the officers entered the apartment and apprehended defendant and the other occupants. The only other allegedly improper comment by the prosecutor was his statement that following the robbery, defendant went to "this bordello drug house, however you want to look at it—."

■ During the State's case in chief, defendant made no objection to the admission of the officer's testimony regarding the man with the firearm or the discovery of drugs and drug paraphernalia. Therefore, any issue as to these questions and comments has been waived for review. (*Enoch*, 122 Ill. 2d at 186.) The only objection that was raised by defense counsel was to the cross-examination of Mosley regarding the presence of drugs and the prosecutor's reference in closing argument to the bordello drug house. In both instances, any potential prejudice to defendant was cured when the objection was sustained. Furthermore, even if the error was not cured, any prejudice that may have resulted was minimal where the ownership of the gun was not attributed to defendant, he denied knowledge of the drugs in the apartment and there were no comments by the prosecutor connecting defendant with the drugs or drug paraphernalia. We

thus conclude that any error that did occur was harmless and did not interfere with defendant's right to a fair trial.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

EGAN and LaPORTA, JJ., concur.