THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL DUNIGAN, Defendant-Appellant.

First District (2nd Division)   No. 1—92—2316

Opinion filed April 26, 1994.

84

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Golden, and Ross M. Eagle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

At approximately 3:30 in the morning of May 19, 1991, T.P. left her place of employment, intending to go to her residence, which was located at the corner of 91st and Loomis in the City of Chicago, four blocks directly east of her work place. She had waited about an hour for her uncle to escort her, but she finally grew impatient with the delay, and headed for home on her own. She walked east on 91st Street, and when she approached the alley between Laflin and Justine Streets, she observed a blue automobile turn into the alley and stop in its opening.

A passenger alighted from the car and proceeded down the alley on foot; the car then left the entrance to the alley, also heading south. T.P. continued walking east until she crossed the alley, whereupon she was seized from behind; and after warning her to be quiet, her attacker dragged her through the alley toward a gangway in the rear of an apartment building.

Once in the gangway, T.P. was forced against a brick wall, where her assailant pinned her by holding his forearm across her throat. In this position, she could see the face of her assaulter, and at trial she

testified that it was defendant. He again told her to be quiet, adding that if she did not cooperate, he would kill her. She noted that even though he controlled her with one arm across her neck, he nevertheless kept the other hand in his pocket.

He released the chokehold on T.P.'s throat and commanded her to undress, but after she did not comply, he removed her pants and underwear himself. Defendant then ordered T.P. to lie on the ground, took off his own pants and underwear, straddled her and inserted his penis into her vagina. Before terminating intercourse, defendant decided that he wanted to continue in a location that would afford him more privacy, and to do so, he stood up and began gathering up T.P.'s clothing.

Seizing the opportunity, she fled east through the gangway, running into the middle of Laflin Street, where she encountered a man walking down the street. The individual, Michael Scott, gave her his jacket to cover her when he saw that she was unclothed, but he could not learn what had happened to her because T.P. was unable to communicate. Instead, she was crying and shaking. She also would not let him touch her. Later, he realized that she was saying that she had been raped.

T.P.'s screams were also heard by Stanley Turner, who lived on the first floor of the apartment building behind which T.P. was assaulted. When he heard screams, he looked out his window and saw a woman emerge from the gangway. He asked her what had happened, and she responded that she was raped. He first phoned the police, and then sought to aid her. Although he was trying to comfort her, she told him to stay away. Turner observed her shaking and he saw that she was constantly pulling on her shirt, attempting to cover herself.

The first officers to respond were Officer Willie McGhee and his partner. When they arrived, McGhee saw two males and a female standing in the middle of Laflin Avenue. The woman was naked from the waist down, she was in a hysterical state and she would not speak to the officers. She stayed that way until Jean Pfeiffer, a female police sergeant, approached and ultimately calmed her. This took some time because the victim was severely traumatized.

When T.P. was finally able to speak, Pfeiffer learned her name as well as coaxed from her the details of the assault. Intending to drive her home, Pfeiffer drove past the corner of 91st and Laflin, where T.P. again became hysterical, pointing to a car and stating that her attacker had exited that car before he assaulted her. T.P. described the rapist as a very dark-complected black male, approximately 30 years old, who was between 5 feet 10 inches and 6 feet tall and

weighed about 190 pounds. In addition, she was certain that he was wearing a white jacket with black stripes. McGhee, who had been driving his own squadrol behind Pfeiffer's, investigated the auto which T.P. had indicated was involved in the incident. He asked its occupant, Calvin Dunigan, to exit the vehicle and to accompany him to Pfeiffer's car. After looking at him, the victim indicated that he was not her assailant. Two days later, after looking at a photo array, T.P. identified defendant as the offender, and she subsequently re-identified him in a lineup conducted after his arrest.

Dr. James Hildebrandt, the State's proffered expert in emergency medicine, testified that when he examined her after the police had taken her to the hospital, T.P. was depressed and distraught, with what he termed a flat affect or an apathetic demeanor. She informed him that she had been raped and complained that she had been punched in the abdomen, which still pained her.

His examination disclosed no signs of trauma to the vaginal area such as tears or abrasions, but, given the elasticity of the muscles in that region, he did not consider that fact significant. His studies suggested that an absence of pelvic area injury was the norm for the victims of sexual assault. Based on her demeanor, he opined that she had in fact been raped.

Defendant's nephew, Calvin Dunigan, refuted the substance of T.P.'s version of the events of that night. He recalled that he and his uncle were driving when they noticed a woman, who he later learned was T.P., walking with two men on 91st Street near Justine Street. Defendant wanted to speak to her, so Dunigan parked the car; defendant exited the vehicle, spoke to T.P. and the men for about 10 or 15 minutes, and returned with her, entering the back seat.

As he drove them to a "crack" house, he overheard defendant ask whether T.P. had "anything to smoke lately," and he heard her answer affirmatively. Defendant then offered to buy her more drugs if she would have sex with him. When the first "crack" house, located at 89th and Loomis, proved not to have any product, Dunigan drove to another one, which was just around the corner from where he initially picked up T.P. He explained that he first went to the more distant house because he knew the dealers at the second one and was reluctant to have them think that he was a crack user.

Both T.P. and defendant left the car at the second stop, after which Dunigan drove to a night spot. After staying there a while, he returned to the area where he had left defendant, and as he sat in the car, he encountered policemen, who instructed him to show himself to a woman seated in a squad car. He was soon taken to a police station and interrogated concerning an assault on that woman.

At that time, he denied any knowledge of the woman or a crime, although he realized that she had been in his car earlier. In fact, he did not say anything about the transaction he witnessed between defendant and T.P. until defendant's trial. The reason he gave for feigning ignorance was that he was scared.

Defendant was found guilty of criminal sexual assault, but not guilty of aggravated criminal sexual assault and not guilty of aggravated kidnapping. The State elected to have him sentenced pursuant to the Habitual Criminal Act (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1 *et seq.*), and established his previous convictions. Based on his two prior convictions for rape, the court adjudged him to be an habitual criminal. The court, therefore, sentenced him to natural life in the custody of the Illinois Department of Corrections.

# I

Defendant first argues that he was denied a fair trial because the trial court allowed the State to introduce into evidence a photo of defendant which depicts him wearing a signboard around his neck, and which clearly appears to be a police "mug shot." This photo was one of an array of five similarly obvious "mug shots" from which T.P. initially identified defendant as her attacker. The State had offered the photos into evidence to demonstrate the consistency with which T.P. had identified defendant, the aim being that of convincing the jury that she had not accused the wrong man. Defendant argues that despite this permissible use of the evidence, he was denied a fair trial because the photo also disclosed that he had been arrested for another crime.

Defendant asserts this objection to the photo for the first time on appeal. In the trial court, he initially objected to allowing the jury to view the photo on the ground that it disclosed his criminal past, but when the court informed him that the photos would be clipped so as to remove the identification record (IR) number, defense counsel agreed that the photos could be admitted. Yet, although the State only partially and inadequately obscured the IR number with "white-out" rather than cropping the photo as promised, defendant did not take issue with the method of redaction used either when the photos were admitted for the jury's consideration during their deliberation or in defendant's post-trial motion. Accordingly, defendant may be deemed to have waived this issue for the purpose of review. See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

In the event that we were to consider this issue as a matter of plain error (see 134 Ill. 2d R. 615(a)), the State argues that "mug shots" have been found to be admissible when the defendant's

identification is material in a particular case. (*People v. Cross* (1981), 100 Ill. App. 3d 83, 426 N.E.2d 623.) In such a case, the photos could be relevant and therefore admissible to show how the defendant came to be arrested for the crime. (*People v. Maffioli* (1950), 406 Ill. 315, 94 N.E.2d 191 (finding that a mug shot of the defendant which bore a date after he was arrested was relevant and material to the issue of how the defendant was first identified by a witness and also on the issue of his hairstyle at the time of his arrest).) But, where the mug shots used tend to advise the jury that the defendant committed some other crime, unrelated to one for which she is on trial, those photos should not be admitted in evidence or shown to the jury. *People v. Arman* (1989), 131 Ill. 2d 115, 545 N.E.2d 658; accord *People v. Warmack* (1980), 83 Ill. 2d 112, 413 N.E.2d 1254; *People v. Murdock* (1968), 39 Ill. 2d 553, 237 N.E.2d 442.

Here as stated, the split-screen photo of defendant showed both a profile and a straight-on view of him in poses traditionally recognized as "mug shots." In addition, although there was an effort to cover up the IR number, it was nevertheless evident that there was a board hanging from defendant's neck. The jury was also informed that T.P. viewed the photo and identified defendant as her attacker the day before he was arrested for the instant offense. Putting this information together, the jury most likely assumed that the photo must have been taken at some date prior to the day he was arrested. Thus, in admitting the "mug shot," the court erred by allowing the jury to learn of defendant's irrelevant previous criminal activities.

However, in *Arman*, the court advised: "The erroneous admission at trial of mug shot evidence suggesting the defendant's involvement in unrelated offenses does not automatically warrant reversal. [Citations.]" (*Arman*, 131 Ill. 2d at 124, 545 N.E.2d at 662.) The court held instead that where proper evidence establishes the defendant's guilt beyond a reasonable doubt and the reviewing court can conclude that after a new trial defendant would nevertheless be convicted, even with the incompetent evidence excluded, the conviction may be affirmed. *Arman*, 131 Ill. 2d at 124, 545 N.E.2d at 662.

The "mug shot" in the instant case certainly cannot be considered to have been vital to defendant's conviction. It was used only to bolster the in-court identification of him made by T.P. In fact, for this purpose the photo array identification was actually cumulative of her pretrial identifications of him since she not only chose him from that array, but also identified him from a lineup. Because the mug shot photo was merely tangential to the State's case against defendant, we may confidently surmise that upon retrial without the inadmissible mug shots, defendant would be reconvicted.

Defendant disagrees with this conclusion. He argues that this case must have turned on credibility because, given the direct conflict over whether T.P. consented to engage in intercourse with defendant, the jury could have reached its verdict only by disbelieving his version of the event. He reasons, therefore, that when the jury deduced from the mug shot that he had a criminal past, it unfairly lowered its assessment of his credibility. He predicts that this would not occur on retrial, absent the photos; therefore, he is entitled to a new trial.

Defendant's argument is meritless. First, it is doubtful that the introduction of the "mug shot" had an appreciable effect on the jury's assessment of the believability of T.P.'s testimony that defendant sexually assaulted her, an act to which she did not consent. This evidence was circumstantially corroborated by the testimony of the other witnesses who testified to T.P.'s conduct after the alleged assault, such as her screaming and shaking and refusal of offers of assistance. The jury could reasonably have found this conduct to be consistent with a recent sexual assault, thus buttressing her testimony. After all, this was the conclusion of the State's expert in emergency medicine who stated that, in his opinion, the near catatonia exhibited by T.P. at the hospital was often one of the characteristics shown by the victims of rape.

Moreover, defendant's argument about the impact of the "mug shot" on his credibility overlooks that he did not testify; therefore, the jury was not called upon to evaluate his veracity. His theory of the case was presented through the testimony of his nephew, Calvin Dunigan, whose apparent capacity for truthfulness could not have been impacted by his uncle's prior criminality as disclosed by the "mug shot." In fact, given that Calvin's testimony was fully impeached by his earlier statements to the police which omitted or contradicted the substance of the tale he told in court, which was the only evidence put forth to support his uncle's defense of consent, it is little wonder that the jury declined to accept defendant's version that T.P. voluntarily agreed to exchange sex for drugs. Since it is obvious that defendant's conviction was based on the strength of the evidence offered against him rather than on any possible prejudice arising from the jury's knowledge of his previous illegal activities, we affirm his conviction.

## II

Defendant next argues that his sentence of life imprisonment must be vacated and that he must be resentenced because the Habitual Criminal Act, pursuant to which he was punished, is unconstitu-

tional. He asserts four grounds establishing the Act's unconstitutionality: (1) it violates the prohibition on *ex post facto* laws and the double jeopardy clauses of the State and Federal Constitutions; (2) it denies due process and violates the requirement of article I, section 11, of the Illinois Constitution because it does not allow the sentencing court to consider mitigating factors or the rehabilitative potential of the individual; (3) it violates the separation of powers clause of the Illinois Constitution by vesting absolute discretion in the prosecutor as to its implementation; and (4) its passage in the General Assembly violated the "single subject" rule of the Illinois Constitution.

These arguments, along with various other challenges to the constitutionality of the Act, have been addressed and rejected by this court repeatedly in the past. (See, *e.g.*, *People v. Knott* (1991), 224 Ill. App. 3d 236, 586 N.E.2d 479, *vacated as moot* (1993), 621 N.E.2d 611 (vacated due to the death of the defendant); *People v. Cardenas* (1991), 209 Ill. App. 3d 217, 568 N.E.2d 102; *People v. Shriner* (1990), 198 Ill. App. 3d 748, 555 N.E.2d 1257, *appeal denied* (1990), 135 Ill. 2d 564, 564 N.E.2d 845; *People v. McCall* (1989), 190 Ill. App. 3d 483, 546 N.E.2d 62, *appeal denied* (1990), 129 Ill. 2d 569, 550 N.E.2d 562; *People v. Franzen* (1989), 183 Ill. App. 3d 1051, 540 N.E.2d 548, *appeal denied* (1990), 133 Ill. 2d 564, 561 N.E.2d 698; *People v. Westefer* (1988), 169 Ill. App. 3d 59, 522 N.E.2d 1381, *appeal denied* (1988), 122 Ill. 2d 591, 530 N.E.2d 261; *People v. Glover* (1988), 173 Ill. App. 3d 678, 527 N.E.2d 968, *appeal denied* (1988), 123 Ill. 2d 562, 535 N.E.2d 405; *People v. Mays* (1988), 176 Ill. App. 3d 1027, 532 N.E.2d 843, *appeal denied* (1989), 127 Ill. 2d 631, 545 N.E.2d 123; *People v. Sims* (1987), 166 Ill. App. 3d 289, 519 N.E.2d 921, *appeal denied* (1988), 119 Ill. 2d 571, 522 N.E.2d 1253; *People v. Cannady* (1987), 159 Ill. App. 3d 1086, 513 N.E.2d 118, *appeal denied* (1987), 117 Ill. 2d 546, 517 N.E.2d 1089; *People v. Morissette* (1986), 150 Ill. App. 3d 431, 501 N.E.2d 781, *appeal denied* (1987), 114 Ill. 2d 554, 508 N.E.2d 733; *People v. Washington* (1984), 125 Ill. App. 3d 109, 465 N.E.2d 666; *People v. Withers* (1983), 115 Ill. App. 3d 1077, 450 N.E.2d 1323.) The most recent appellate court case which held that the Act withstood constitutional scrutiny was *People v. Wilson* (1994), 257 Ill. App. 3d 826.

All of defendant's complaints regarding the Act were considered by this court in *People v. McDarrah* (1988), 175 Ill. App. 3d 284, 297-98, 529 N.E.2d 808, 817, *appeal denied* (1988), 123 Ill. 2d 563, 535 N.E.2d 407, where the court wrote:

"Defendant next presents four arguments challenging the constitutionality of the Habitual Criminal Act (Act) (Ill. Rev. Stat.

1985, ch. 38, par. 33B—1 *et seq.*). Defendant contends that the Act is unconstitutional in that it (1) was enacted in violation of article IV, section 8(d), of the Illinois Constitution because it was not read three times in the House of Representatives; (2) does not permit consideration of the offender's personal characteristics and seriousness of the offense in violation of the due process clause and eighth amendment of the United States Constitution; (3) places the sentencing discretion in the State's Attorney rather than the judiciary in violation of the separation of powers doctrine of the Illinois Constitution and eighth amendment of the United States Constitution; and (4) violates the provisions of the Illinois and United States Constitutions prohibiting *ex post facto* laws and double jeopardy. Each of these arguments has been addressed and rejected in numerous appellate court decisions. (See *People v. Sims* (1987), 166 Ill. App. 3d 289, 302-03[, 519 N.E.2d 921] (compilation of cases upholding the constitutionality of the Act).) Most recently, this court adopted these holdings and rejected the identical four challenges presented here. (See *People v. Westefer* (1988), 169 Ill. App. 3d 59, 64-65[, 522 N.E.2d 1381].) Defendant's contentions do not raise new theories nor present compelling arguments for this court to retreat from *Westefer* or the numerous other decisions finding the Act constitutional. Accordingly, we find defendant's constitutional challenges to the Act to be without merit."

Although defendant acknowledges in an especially understated manner that appellate court cases have rejected his arguments concerning the Act, like the defendant in *McDarrah*, he does not assay even an attempt at persuading this court that those cases were wrong. Instead, after admitting that his arguments have not been accepted by this court, he simply invokes, like a litany, the same tired arguments, seemingly oblivious to the holdings of the cases which have come before. Since he offers us nothing which exposes any infirmity in the logic of that uninterrupted body of law, we find, once again, that the Act is constitutional and, as a result, his sentence is affirmed.

Affirmed.

DiVITO, P.J., and McCORMICK, J., concur.