THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY WESTBROOK, Defendant-Appellant.

First District (3rd Division)   No. 1—88—0974

Opinion filed September 9, 1992.—Rehearing denied October 20, 1992.

838

Rita A. Fry, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Catherine A. Hufford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant Johnny Westbrook was found guilty of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14), and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2). Defendant was sentenced to concurrent terms of 60 years' imprisonment for aggravated criminal sexual assault and 30 years' imprisonment for aggravated kidnapping. We affirm.

The issues before this court for review are (1) whether the trial

court erred when it ruled that the police had probable cause to stop and arrest defendant; (2) whether the trial court violated defendant's sixth amendment right to counsel when it denied his motion to suppress identification after he was precluded from having an attorney present at his lineup; (3) whether the trial court erred in denying defendant's motion to suppress identification because his pretrial lineup was impermissibly suggestive and conducive to mistaken identification; (4) whether the admission of a certain police officer's testimony violated the trial court's prior ruling on defendant's motion *in limine* and constituted grounds for a mistrial; (5) whether the trial court's admission of a certain police officer's rebuttal testimony deprived defendant of his sixth amendment right to cross-examine a witness and his fourteenth amendment right to a fair trial; (6) whether portions of the State's closing argument violated defendant's constitutional right to a fair trial; and (7) whether defendant received a fair sentencing hearing where the trial judge considered a prison incident report as evidence in aggravation and where the sentencing court noted that defendant fathered seven children out of wedlock.

Westbrook was arrested for unlawful use of a weapon on July 16, 1985. He was later indicted for aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14), and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2), for the sexual assault of 13-year-old G.C. on June 12, 1985, in Markham, Illinois.

Prior to trial, Westbrook filed a motion to quash his arrest and suppress evidence obtained therefrom, on the basis that the police did not have probable cause to stop him or arrest him. At the hearing on defendant's motion to quash arrest and suppress evidence, Sergeant Henry Wilson testified that he and his partner, Lieutenant Jeffrey Gordon, were patrolling the area near the Country Aire subdivision in Markham, Illinois, on the night of July 16, 1985. Sergeant Wilson further testified that he and Lieutenant Gordon were on patrol in Markham, Illinois, on that date in an effort to obtain information regarding several sexual assaults upon women which had occurred in the area. Sergeant Wilson testified that around 11 p.m., he and Lieutenant Gordon were in the vicinity of Rosner and Birch Streets, a location approximately 200 feet from the location of G.C.'s rape. Sergeant Wilson stated that at that time, he saw a man running out of a park, and that the subject was looking over his left shoulder in the direction of the park as he was running. Sergeant Wilson told the court that he noticed the subject fit the general description of G.C.'s assailant, whereupon he identified himself as a police officer and asked the suspect to move toward him. Sergeant

Wilson related that the suspect was wearing "Army fatigue" pants, a purple shirt, a jacket, black high-top shoes and a knapsack tied around his waist and thigh. Sergeant Wilson testified that the suspect approached the police officers with his hands in his pants pockets. Sergeant Wilson stated that he asked the suspect to remove his hands from his pockets. The suspect removed his hands from his pockets whereupon Sergeant Wilson observed the butt of a handgun in the suspect's pocket. Sergeant Wilson testified that the suspect was later identified as Johnny Westbrook. The suspect was then arrested for unlawful use of a weapon. (Ill. Rev. Stat. 1985, ch. 38, par. 24—1.) The officers recovered a .357 Smith and Wesson handgun loaded with six live rounds, additional ammunition and a folding knife from Westbrook's person.

On redirect examination, Sergeant Wilson stated that he did not recognize Westbrook as matching a composite sketch of G.C.'s assailant when he initially saw him, but that he did match the general description of the assailants described by several rape victims who had been assaulted recently in the vicinity of the Country Aire subdivision.

Lieutenant Gordon corroborated Sergeant Wilson's testimony. On cross-examination, Lieutenant Gordon stated that prior to the arrest, Westbrook seemed to match the general description of G.C.'s assailant. Lieutenant Gordon further testified that after the arrest, he felt that defendant matched the composite accurately. After the hearing, the trial court denied defendant's motion to quash and suppress.

Defendant also moved to suppress his lineup identification on the basis that the lineup was impermissibly suggestive and because he was not allowed to have an attorney present. At the hearing on defendant's motion, Sergeant Wilson testified that he conducted the lineup on July 18, 1985, in which defendant was identified by G.C. as her assailant. Sergeant Wilson stated that the men in the lineup had the following characteristics: The man in the first position was 5 feet 9 inches tall, weighed 200 pounds and was 21 years old; the second position was occupied by a man who was 6 feet tall, 160 pounds and 18 years of age; and the third position was occupied by a man who was 6 feet 3 inches tall, 195 pounds and 20 years old. Sergeant Wilson told the court that defendant stood in position number 4, and that he was 5 feet 11 inches tall, 172 pounds and 32 years of age at the time of the lineup. He further testified that all of the participants had facial hair.

On cross-examination, Sergeant Wilson admitted that a composite sketch of the suspect was hanging on the bulletin board in the

lineup room. Sergeant Wilson further related that the victim recognized Westbrook as her assailant before he stepped forward or said anything.

During the hearing, Westbrook testified that the police told him that he would be in a lineup. Westbrook maintained that he refused to participate in the lineup and that he asked to speak to an attorney. Westbrook stated that the police refused to allow him to speak to an attorney and that they told him that he would be forced to participate in the lineup.

On cross-examination, Westbrook testified that he requested a lawyer on at least three occasions and that he telephoned his parents and asked them to retain a lawyer, but that they were unable to afford to hire counsel to defend him. Westbrook also insisted that he did not select lineup position number 4.

Sergeant Wilson testified on redirect examination that he gave Westbrook *Gilbert* warnings one hour before the lineup, that he asked him to choose a lineup position at that time and that Westbrook chose position number 4. See *Gilbert v. California* (1967), 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951.

During cross-examination, Sergeant Wilson stated that Westbrook indicated that he understood the *Gilbert* warnings and he waived his right to have counsel present at his lineup. Sergeant Wilson, however, admitted that his report does not indicate that Westbrook specifically waived his right to an attorney. After the hearing, the trial court denied defendant's motion to suppress identification.

Westbrook also made a motion *in limine* to bar the admission of evidence concerning any other rape case. The court granted Westbrook's motion. The court also prohibited the State from mentioning the words "rape" or "aggravated criminal sexual assault," although it ruled that the State could elicit testimony that there was an ongoing police investigation of a series of assaults in Markham, Illinois, at the time Westbrook was arrested.

At trial, several witnesses testified for the State including the victim, G.C., the victim's mother, T.C., Dr. Ban Toh, Mohammad Tahir, Cheryl Humphrey, Charles Stennich, police officer Willie Earl Jones, Sergeant Henry Wilson, and Lieutenant Jeffrey Gordon. G.C. testified that on June 12, 1985, she lived in the Country Aire subdivision in Markham, Illinois. G.C. told the court that at approximately 9 p.m. on June 12, 1985, she walked to Kathy Hall's residence, which was two blocks away from her home, in order to use Hall's telephone. G.C. testified that she left Hall's residence at approximately 9:30 p.m. and walked back toward her own home. G.C.

stated that she observed a van proceeding down Maple Street as she crossed the avenue. G.C. testified that a few moments later, Westbrook approached her from behind, grabbed her around the neck, and threatened to shoot her if she screamed. She told the court that Westbrook then placed a gun to her neck and forced her into the van which was parked on Maple Street. G.C. testified that the exterior of the van was blue. G.C. stated that after she and Westbrook entered the van, he positioned her on her knees between the two front seats and pointed the gun at her neck. G.C. related that Westbrook then told her to keep her head down while he drove the van.

G.C. told the court that Westbrook drove the van to a nearby park. G.C. related that upon stopping the van, Westbrook pushed her into the back of the vehicle, placed the gun in his pocket, and removed a knife. G.C. testified that Westbrook then told her to remove her clothing. G.C. stated that when she refused to undress, Westbrook pushed her down, pulled her shirt over her head and slashed her pants. G.C. recalled that she struggled with Westbrook thereafter, and that he struck her in the face during this struggle. G.C. testified that Westbrook then got on top of her and forced his penis inside of her vagina. G.C. further testified that during the rape, Westbrook used the knife to cut her arms and he threatened to shoot her if she continued to resist him. G.C. testified that Westbrook wore a bandanna over his face during the assault, but that the scarf fell off of his face twice, allowing her to see his facial features, which were illuminated by the dashboard lights and the lights from neighboring homes.

After the assault, Westbrook pushed G.C. out of the van and drove away. G.C. then walked back to the Halls' residence and told the Hall family what had occurred. The Halls notified G.C.'s mother and summoned the police. T.C., the victim's mother, testified that Mr. Hall told her about the assault and asked her to come to his home. T.C. testified that when she arrived at the Halls' home, her daughter's hair was disheveled, her pants were torn and she had no shoes on her feet. T.C. also observed that G.C. had cuts on her arm and that her face was swollen. T.C. stated that G.C. was extremely upset and that she said she had been raped.

Sergeant Henry Wilson of the Markham police department testified that he visited the Halls' residence on the evening of June 12, 1985, and that he first met the victim at this time. Sergeant Wilson stated that after meeting G.C., he followed her to South Suburban Hospital.

Dr. Ban Toh of South Suburban Hospital testified that he examined G.C. on June 12, 1985. Dr. Toh stated that he observed a

four-inch laceration on G.C.'s right shoulder, a one-inch laceration on her left shoulder and a two-inch laceration on her left forearm. Dr. Toh testified that G.C.'s upper lip was swollen and discolored. Dr. Toh also stated that he found blood in the victim's vagina and that he obtained a sample of the blood.

Mohammad Tahir, a forensic serologist, told the court that he tested the blood sample obtained by Dr. Toh and found semen in the blood. Tahir testified that the semen was excreted from a black male, and that the secretor had type O blood. Tahir maintained that defendant could not be eliminated as a possible assailant.

After G.C. was treated at the hospital, she gave Sergeant Wilson a description of her assailant. Sergeant Wilson testified that G.C. described her assailant as a black male, between 5 feet 9 inches and 6 feet tall with a medium brown complexion, a short beard, and a scar on the left side of his face. G.C. also related to Sergeant Wilson that her assailant had a very deep voice. Sergeant Wilson further testified that G.C. told him that her assailant was armed with a pocket knife or a folding knife and a handgun. On June 13, 1985, G.C. went to the Markham police department and helped Sergeant Wilson make a composite sketch of her assailant. When G.C. identified defendant in the lineup on July 18, 1985, she recognized his face and voice.

Cheryl Humphrey next testified that as of June 12, 1985, she owned a 1977 blue Ford van. Humphrey testified that on that date, she entered the Carousel Lounge in Midlothian, Illinois, between 9 p.m. and 9:20 p.m., whereupon she left her van parked near the lounge on 147th Street near Homan Street. Humphrey stated that she observed a black male move toward her van as she walked toward the lounge. Humphrey noted that the man was approximately 5 feet 11 inches tall, and that he wore blue jeans and a dark jacket. Humphrey exited the lounge approximately 20 minutes later. At that time, her van was gone. Humphrey reported the theft of her van to area police.

Charles Stennich then testified that at approximately 10:30 p.m. on June 12, 1985, he observed a blue van pull onto Sacramento Street near his home located at 1311 Sacramento in Worth Township, Illinois. Stennich stated that the van traveled at a slow rate of speed before the driver parked it. Stennich saw a black male exit the vehicle. Stennich noted that the man wore a brown flannel shirt and blue jeans, and that he was between 5 feet 8 inches and 6 feet tall.

Officer Willie Earl Jones testified that he was assigned to investigate an abandoned vehicle located at 131st and Sacramento Streets on June 13, 1985. Officer Jones told the court that he went to

that location and observed a blue Ford van. Upon researching the license plate number on the van, Officer Jones discovered that the van had been stolen from a street in Midlothian, Illinois, and that it was wanted in connection with a rape investigation. Officer Jones secured the van and tendered it to Sergeant Wilson.

Next, Sergeant Wilson and Lieutenant Gordon testified before the trial court. Their testimony at trial was virtually identical to their testimony during the pretrial hearings on Westbrook's motions. The State rested.

Defendant called Michael Podlecki, a forensic scientist specializing in serology and hemomicroscopy. Podlecki testified that he compared hairs that were recovered from the van and G.C.'s clothing to hair belonging to G.C. and Westbrook. Podlecki testified that none of the hairs were consistent with Westbrook's hair but that some of the hairs were very similar to the victim's hair.

The defense also called Lachom Madison, an evidence technician, and James Fazekas, a latent fingerprint examiner. Madison testified that he took impressions of latent fingerprints from the van. Fazekas testified that he then compared defendant's fingerprints to five unidentified latent impressions, and testified that none of the fingerprints belonged to defendant. Fazekas also told the court that he was asked to compare the latent fingerprints to the fingerprints of another suspect named James E. Moore, but that he did not compare Moore's fingerprints to the latent impressions because he never received Moore's fingerprint card.

On rebuttal, Sergeant Wilson testified that Moore was a suspect in the investigation of G.C.'s assault because he matched the description of G.C.'s assailant. Sergeant Wilson stated that Moore's fingerprints were never compared to Westbrook's fingerprints because he remembered Moore from "the neighborhood" and he knew that Moore did not have facial hair, and because G.C. told him that she knew Moore and that Moore was definitely not her assailant.

The jury found Westbrook guilty of aggravated criminal sexual assault and aggravated kidnapping. During the sentencing hearing, the State submitted aggravating evidence in the form of a report from the Menard Correctional Center signed by prison officials. The report catalogued several disciplinary infractions made by Westbrook while he was incarcerated for previous offenses. The report also identified Westbrook as a member of the Black Gangster Disciples street gang. The court found Westbrook eligible for an extended-term sentence. In sentencing Westbrook, the court stated that he was "totally irresponsible" because he fathered seven children out of wedlock. Westbrook was sentenced to an extended term of 60 years'

imprisonment for aggravated criminal sexual assault and 30 years' imprisonment for aggravated kidnapping. This appeal followed.

■ First, defendant contends that the police had no probable cause to stop him or arrest him. The State maintains that Sergeant Wilson and Lieutenant Gordon had a right to stop and briefly detain defendant in order to determine whether or not he was guilty of a crime, upon observing him run from an area where several sexual assaults had recently occurred. The State further argues that after detaining defendant, probable cause to arrest him arose once the police observed the gun in his pocket. We agree.

In *Terry v. Ohio* (1968), 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880, the United States Supreme Court ruled that "a police officer may [under] appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." The Supreme Court in *Terry* recognized that it is important for police to adopt an "intermediate response" prior to arresting a suspect. (*Terry*, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881.) The Supreme Court in *Adams v. Williams* (1972), 407 U.S. 143, 146, 32 L. Ed. 612, 617, 92 S. Ct. 1921, 1923, later ruled that an "intermediate response" may consist of a brief stop of a suspicious individual in order to determine his identity or to maintain the status quo while obtaining other information. This court has held that a stop, however, must be objectively reasonable and that the detaining officer must be able to point to "specific and articulable facts," which, if viewed in conjunction with rational inferences that may be drawn therefrom, reasonably warrant the intrusion. *People v. Mata* (1988), 178 Ill. App. 3d 155, 159-60, 533 N.E.2d 370, 374.

In the present case, the arresting officers testified that they were in the Country Aire subdivision at 11 p.m. The officers stated that they were investigating recent sexual assaults that occurred in the area. Sergeant Wilson and Lieutenant Gordon testified that they saw defendant running out of the park. Sergeant Wilson recalled that he identified himself as a police officer and asked defendant to move toward him. The officers stated that defendant then approached them with his hands in his pants pockets. On the basis of the aforementioned case law and the above facts, Sergeant Wilson's stop of defendant constituted an "intermediate response" made in order to obtain additional information while maintaining the status quo. The stop was objectively reasonable because the police officers knew that several assaults, including G.C.'s, had occurred in the immediate vicinity of where they were standing at the time they saw defendant. Accordingly, we find that the stop was proper.

Furthermore, we find that defendant's arrest was proper. "Probable cause to arrest exists where the police have knowledge of facts which would lead a reasonable person to believe a crime has been committed by the person arrested." (*People v. Stuckey* (1992), 231 Ill. App. 3d 550, 560; *People v. Erby* (1991), 213 Ill. App. 3d 657, 664, 572 N.E.2d 345, 349.) The inquiry which should be made in determining if probable cause for a warrantless arrest of a suspect existed at the time of the arrest is whether a reasonable person in the police officer's position would have believed that the suspect committed a crime. (*People v. Adams* (1989), 131 Ill. 2d 387, 398, 546 N.E.2d 561, 566.) A trial court's ruling on a motion to quash arrest and suppress evidence will not be disturbed by a court of review unless the finding is manifestly erroneous. *People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197; *People v. Redd* (1990), 135 Ill. 2d 252, 268, 553 N.E.2d 316, 322; *People v. Stuckey* (1992), 231 Ill. App. 3d 550, 560.

■ In the present case, Sergeant Wilson asked defendant to remove his hands from his pockets whereupon the officer observed the butt of a handgun in defendant's pocket. Once Sergeant Wilson observed that defendant had a gun, the police had probable cause to arrest him. At this point, the circumstances were sufficient to lead a reasonable person to believe that defendant committed a crime: defendant had a gun; the police knew that several women including G.C. had been raped in the area; and the police knew that G.C.'s assailant used a gun during the assault. Accordingly, we find that the police had probable cause to arrest defendant. See *People v. Boyce* (1981), 95 Ill. App. 3d 740, 420 N.E.2d 687.

■ Defendant has failed to demonstrate that the trial court's ruling on his motion to quash arrest and suppress evidence was manifestly erroneous. The trial court's ruling was supported by the evidence. For the above reasons, we find that the police properly stopped defendant in order to determine whether he was guilty of a crime, and that upon detaining him, probable cause to arrest him arose when the police observed the gun in his pocket. The trial court's ruling on defendant's motion to quash and suppress was not manifestly erroneous. We therefore affirm the trial court's ruling on defendant's motion.

The next two questions before this court concern the propriety of defendant's lineup identification. Prior to trial, defendant moved to suppress his lineup identification on the basis that the lineup was impermissibly suggestive and because he was not allowed to have an attorney present. The trial court denied defendant's motion. The trial court's ruling on defendant's motion to suppress identification

may not be disturbed unless it was against the manifest weight of the evidence. *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898, 899.

■ First, defendant contends that the trial court erred in denying his motion to suppress his lineup identification because his right to counsel guaranteed by the sixth amendment to the United States Constitution was violated when he was precluded from having an attorney present at his pretrial lineup. Defendant alleges that his arrest and charge for unlawful use of a weapon marked the beginning of adversarial proceedings against him, thereby triggering his sixth amendment right to have counsel present at the lineup in which G.C. identified him as her assailant. The State maintains that although defendant was initially arrested for unlawful use of a weapon, the arrest did not trigger his sixth amendment right to have counsel present at the lineup because adversarial judicial proceedings for aggravated criminal sexual assault and aggravated kidnapping had not been initiated against him at that time. We agree.

An accused's sixth amendment right to counsel attaches only at the time that adversarial judicial criminal proceedings have been initiated against him by way of formal charge, preliminary hearing, indictment, information or arraignment. (*Kirby v. Illinois* (1972), 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82; *People v. Hayes* (1990), 139 Ill. 2d 89, 123, 564 N.E.2d 803, 817; *People v. Wilson* (1987), 116 Ill. 2d 29, 50, 506 N.E.2d 571, 580.) Although the sixth amendment right to counsel is guaranteed when adversarial proceedings have been initiated, said right is not invokable by an accused during the fact finding process prior to the commencement of adversarial proceedings (*People v. Williams* (1991), 244 Ill. App. 3d 5, 8-9), even where the accused's right to counsel has already attached with respect to an unrelated charge. (*People v. Evans* (1988), 125 Ill. 2d 50, 78, 530 N.E.2d 1360, 1372.) When the State charges a defendant with a criminal offense, the State's action does not indicate that it is committed to charge and prosecute the defendant later for other unrelated crimes. See *Hayes*, 139 Ill. 2d at 125-26, 564 N.E.2d at 818.

In the present case, defendant was arrested and charged with unlawful use of a weapon on the night of his arrest, which was two days prior to the lineup. Thus, it is clear that adversarial judicial criminal proceedings had been initiated against defendant prior to the lineup for the crime of unlawful use of a weapon. At the time of the lineup, defendant's sixth amendment right to counsel had attached with respect to the charge for unlawful use of a weapon. Defendant's sixth amendment right to have counsel present at his lineup, however, had not attached with respect to the crimes of

aggravated criminal sexual assault and aggravated kidnapping. (See *Hayes*, 139 Ill. 2d at 125-26, 564 N.E.2d at 818.) Adversarial judicial proceedings for aggravated kidnapping and aggravated criminal sexual assault had not commenced against defendant by means of formal charge, preliminary hearing, indictment, information or arraignment at the time of the lineup. The trial court did not encroach upon defendant's sixth amendment right to counsel because defendant's arrest for unlawful use of a weapon did not trigger defendant's sixth amendment right to counsel with respect to the charges of aggravated criminal sexual assault and aggravated kidnapping. Accordingly, the trial court did not violate defendant's sixth amendment right to counsel when it denied his motion to suppress his identification, as its finding was not against the manifest weight of the evidence.

Defendant also contends that the trial court erred in denying his motion to suppress identification because the lineup was unnecessarily suggestive and conducive to mistaken identification. The State maintains that the lineup in which the victim identified defendant was neither unnecessarily suggestive nor conducive to mistaken identification because each of the participants in the lineup possessed characteristics described by the victim, and because the victim subsequently identified defendant in court. We agree.

"Evidence of pretrial identifications of an accused by a witness must be excluded at trial only where (1) the procedure was unnecessarily suggestive and (2) there was a substantial likelihood of misidentification." (*People v. Hartzol* (1991), 222 Ill. App. 3d 631, 642, 584 N.E.2d 291, 299-300.) A defendant bears the burden of establishing at the hearing on his motion to suppress identification that within the context of the totality of the circumstances, his pretrial lineup identification was so unnecessarily suggestive that it gave rise to a substantial likelihood of irreparable mistaken identification. (*Stovall v. Denno* (1967), 388 U.S. 293, 301-02, 18 L. Ed. 2d 1199, 1206-07, 87 S. Ct. 1967, 1972-73; *People v. Harris* (1991), 220 Ill. App. 3d 848, 860, 580 N.E.2d 1342, 1350.) Even where a pretrial identification is found to be improper, an in-court identification by a witness may still be allowed, provided that the State establishes by clear and convincing evidence that the defendant's identification is based upon an observation independent of and prior to the tainted out-of-court lineup identification. *Harris*, 220 Ill. App. 3d at 860-61, 580 N.E.2d at 1350.

■ Defendant's contention lacks merit as the trial court's finding on this issue was not against the manifest weight of the evidence. The victim described her assailant as a male with facial hair who

was approximately 5 feet 10 inches to 6 feet tall, with brown eyes, black hair, and a deep voice. Any one of the participants in the lineup could have been identified by G.C. on the basis of his appearance because all of the participants were between 5 feet 10 inches and 6 feet tall and each of the participants had some facial hair. The amounts of facial hair on the participants varied, but this was not suggestive as the lineup was conducted approximately one month after G.C.'s rape. There is no requirement that the participants in a lineup be identical. (*People v. Johnson* (1991), 222 Ill. App. 3d 1, 8, 582 N.E.2d 1331, 1335, citing *People v. Cardenas* (1991), 209 Ill. App. 3d 217, 227, 568 N.E.2d 102, 109.) For the above reasons, we find that defendant's lineup was not unnecessarily suggestive. Moreover, even if the lineup was suggestive, reversal of defendant's conviction is not warranted since the victim's identification testimony at trial was credible and the State has established by clear and convincing evidence that the victim's identification of defendant was based upon an observation prior to and independent of the lineup. G.C.'s identification of defendant at the lineup is credible because she not only identified him on the basis of his appearance, but she also recognized his voice. Furthermore, G.C. testified at trial that the scarf which defendant used to cover his face fell down twice, allowing her to see his facial features, which were illuminated by the dashboard lights in the van.

■ Finally, defendant's argument that his identification does not meet the requirements set forth in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, is not supported by the record. The Supreme Court in *Manson* held that due process did not require the exclusion of pretrial identification evidence obtained by suggestive post-*Stovall* police lineups, so long as the identification was reliable within the context of the totality of the circumstances. (*Manson*, 432 U.S. at 114-17, 53 L. Ed. 2d at 154-55, 97 S. Ct. at 2253-54.) Specifically, the *Manson* court found that five factors should be considered by a reviewing court in determining the reliability of identification testimony. "These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." (*Manson*, 432 U.S. at 114, 53 L. Ed. 2d at 154, 97 S. Ct. at 2253.) The victim's identification of defendant is reliable pursuant to the *Manson* guidelines.

For the aforementioned reasons, we affirm the trial court's ruling on defendant's motion to suppress his identification, as the ruling was neither violative of defendant's sixth amendment right to counsel, unnecessarily suggestive and conducive to mistaken identification, nor contrary to the manifest weight of the evidence.

Next, defendant contends that Sergeant Wilson's testimony whereby he stated that he was "investigating a series of attacks" violated the trial court's prior ruling on his motion *in limine*, which prohibited the use of the words "rape" or "aggravated criminal sexual assault," and that his subsequent motion for a mistrial was improperly denied because the testimony in question violated the court's prior ruling on the motion.

Prior to trial, defense counsel filed a motion *in limine* seeking to prohibit the State from presenting testimony concerning other rapes which had occurred in the area and references to the theory that defendant may have perpetrated those crimes. The trial court made the following statement when ruling on defendant's motion:

> "THE COURT: Well, this motion doesn't seek to bar the State from eliciting testimony about the circumstances of defendant's arrest.
>
> It merely seeks to restrain the State from referring to rape or a series of rapes, or an allegation of involvement with other offenses by this defendant.
>
> Now, I am going to deny the defense's motion with a caveat to the State, and the defense may reraise the issue at the appropriate time when it looks like we are getting into dangerous water.
>
> The court will permit the defense and the prosecution to have its witness testify concerning the incident of the arrest. And to let the officer testify that he was on an investigation in a series of assaults, without the use of the [words] rape or aggravated criminal sexual assault, investigating an assault that had occurred in the park area and that should suffice from the standpoint of the prosecution without unduly prejudicing the defendant."

During the trial, Sergeant Wilson testified that on July 16, 1985, he was "checking the Country Aire Subdivision and areas throughout that subdivision, parks, playgrounds, so on and so forth for any information and leads into an assault on women in that area." Defendant then objected to Sergeant Wilson's remarks on the grounds that they violated the trial court's ruling on his previous motion *in limine* and moved for a mistrial. Defendant's motion for a mistrial was denied.

■ The trial court's ruling was not violated by the admission of Sergeant Wilson's testimony. In ruling upon defendant's motion *in limine*, the trial court stated that the State could "have its witness testify concerning the incident of the arrest," and that the arresting

officer could "testify that he was on an investigation in a series of assaults." Sergeant Wilson stated that he was investigating a series of attacks upon women when he saw defendant. Contrary to defendant's assertion, Sergeant Wilson's testimony was proper. "The trial court has broad discretion to determine the propriety of declaring a mistrial." (*People v. Hall* (1986), 114 Ill. 2d 376, 405, 499 N.E.2d 1335, 1346.) In order to establish the necessity for a mistrial, it must appear that the jury has been so influenced and prejudiced that it would not, or could not, be fair and impartial and the damaging effect of the evidence cannot be remedied by admonitions or instructions. (*People v. Camden* (1991), 219 Ill. App. 3d 124, 136, 578 N.E.2d 1211, 1220.) In the present case, there is no evidence in the record which indicates that Sergeant Wilson's testimony had a prejudicial effect upon defendant. The trial court, in its ruling upon defendant's motion *in limine*, considered the prejudice which could result from testimony presented by the State and restricted the State in its examination of Sergeant Wilson. Accordingly, we rule that Sergeant Wilson's testimony was not violative of the court's ruling on defendant's motion *in limine* and that the court's refusal to grant defendant's motion for a mistrial was not erroneous.

The next issue before this court is the question of the propriety of the trial court's admission of Sergeant Wilson's rebuttal testimony concerning defendant's identification. Defendant contends that the trial court's admission of Sergeant Wilson's rebuttal testimony deprived him of his sixth amendment right to confront and cross-examine a witness and his fourteenth amendment right to a fair trial, because the testimony in issue was hearsay. Defendant argues that Sergeant Wilson's testimony constituted hearsay because he testified concerning an out-of-court statement made by G.C. The State maintains that Sergeant Wilson's rebuttal testimony was properly introduced to disprove defendant's inference that there was another suspect besides himself who was never fully investigated and because the testimony concerned the material issue of defendant's identification. The State maintains that Sergeant Wilson's testimony was not hearsay because the testimony was not offered for the truth of the matter asserted, but was instead offered to illustrate the policeman's course of action in order to establish that he conducted a thorough investigation of G.C.'s assault, especially with regard to the involvement of defendant and another suspect, James E. Moore.

At trial, James Fazekas, a fingerprint expert, testified that he was asked to compare Moore's fingerprints to the fingerprints found at the scene of the crime, but that he never compared the fingerprints because he never received Moore's fingerprint card.

In rebuttal, Sergeant Wilson testified that he was informed during the investigation that Moore matched the description of the offender. Sergeant Wilson further related that Moore's fingerprint card was obtained and forwarded to the fingerprint identification lab, but that Moore's prints were never compared to the prints found at the scene of the crime since he knew that Moore did not have a beard and that G.C.'s assailant had facial hair, and because G.C. told him that she knew Moore and that Moore definitely was not her assailant. The following colloquy occurred at trial:

> "[THE STATE]: And did you take a photograph of James E. Moore to the victim?
>
> [SERGEANT WILSON]: He was among several, yes.
>
> [THE STATE]: And did she identify James E. Moore?
>
> [THE DEFENSE]: Objection, hearsay.
>
> [THE COURT]: Overruled.
>
> [SERGEANT WILSON]: She related that she knew him and he definitely was not the subject."

Rebuttal evidence offered by the State is admissible only if it tends to "explain, repel, contradict or disprove the evidence of the defendant"—even if it would have been admissible in the State's case in chief before the State closed. (*People v. Waller* (1977), 67 Ill. 2d 381, 387, 367 N.E.2d 1283, 1285; see also *People v. Ross* (1981), 100 Ill. App. 3d 1093, 1096, 427 N.E.2d 868, 870.) A rebuttal witness may be called to contradict the defendant's testimony as to a material issue, but not as to a collateral immaterial matter. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 538, 362 N.E.2d 14, 21.) A police officer may testify that he had a conversation with an individual, and that he subsequently acted thereon, without revealing the substance of the conversation. Such testimony is competent to show the officer's investigatory procedure. Testimony of this nature is not hearsay as it is based upon the police officer's personal knowledge. (*People v. Batson* (1992), 225 Ill. App. 3d 157, 165, 587 N.E.2d 549, 554; *People v. White* (1985), 134 Ill. App. 3d 262, 282, 479 N.E.2d 1121, 1134.) Reversal is not automatically warranted, however, where such hearsay evidence was admitted at trial. The admission of hearsay evidence is harmless error where there is no reasonable probability that the jury would have acquitted the defendant if the hearsay evidence had been excluded. *White*, 134 Ill. App. 3d at 283, 479 N.E.2d at 1134-35.

■ In the present case, we find that the State was entitled to give its reason for dismissing a suspect by means of rebuttal testimony since the propriety of defendant's identification was a material issue. The trial court, however, erred when it overruled defendant's

objection to Sergeant Wilson's testimony because the testimony in question was hearsay since Sergeant Wilson revealed the substance of his conversation with the victim. Sergeant Wilson told the court that G.C. told him that she knew Moore and that Moore definitely was not her assailant. The trial court's admission of this evidence did not constitute reversible error, however, because there is no reasonable probability that the jury would have acquitted defendant had this evidence been excluded. Accordingly, we find that Sergeant Wilson's testimony was properly admitted by the trial court and that the admission of this testimony did not deprive defendant of his sixth and fourteenth amendment rights.

Next, defendant contends that portions of the State's closing argument violated his constitutional right to a fair trial because the prosecutor misstated the evidence and misled the jury. The State maintains that the prosecutor's arguments were based upon the testimony at trial and reasonable inferences drawn therefrom, and that his comments were provoked by defendant's closing argument.

During its closing argument, the prosecution stated that defendant's scar could have been obscured during the trial by his facial hair, it argued that the victim was shown two guns which were the same color, and it stated that only three of the hairs found at the scene of the crime were dissimilar to defendant's hair while three other strands of hair obtained from the van were similar to defendant's and G.C.'s hair.

■ First, the prosecutor's assertion that defendant's facial hair may have covered the scar was invited by defense counsel's closing argument. "Where defense counsel provokes a response, defendant cannot complain that the State's reply denied him a fair trial." (*People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291, 297.) Defense counsel, in his closing argument, implied that the victim's testimony with respect to her assailant's identity was not truthful and that she was mistaken about the presence of scars on defendant's face. The prosecutor subsequently gave a reasonable explanation for the lack of noticeable scars on defendant's face at the time of the trial. The State argued that while defendant did not have apparent scars on his face at the time of the trial, G.C. described her assailant as having newly grown facial hair at the time of the assault and she later testified that defendant's facial hair was longer and thicker at the lineup than it was the night she was assaulted, and it is therefore possible that defendant's facial hair covered the scar during the trial. For the above reasons, we find that the prosecutor did not err when it commented upon defendant's appearance.

Defendant's second contention concerning the prosecution's al-

leged misstatement of the evidence is valid. It is improper for a prosecutor to misstate the evidence or argue facts which are not in evidence. (*People v. Albanese* (1984), 104 Ill. 2d 504, 519, 473 N.E.2d 1246, 1252.) The State made the following representations during its closing argument regarding the victim's previous description of her assailant's gun:

"[THE STATE]: As far as the gun is concerned, I think it is clear that the victim said that looks like the gun. *** She said that looks like the gun. And the way the description came out, it was either the hospital or the police station, I think when you consider the circumstances under which it is made, it is quite readily understandable how it occurred. This was a young kid, 13 years old, and while it may at first flush seem hard to believe in this day and age that nobody has ever seen a gun at 13, I would submit to you it is quite reasonable for a young kid who lives at home with her mother, only on TV, to never have a gun in their home. There are lots of people, N.R.A. to the contrary, that don't have guns in their homes. So there are lots of people that just don't see them or use them or are afraid of them for whatever reason.

THE COURT: Are you about finished counsel?

[THE STATE]: About ten minutes, your Honor.

So the fact that this little girl had never seen a gun before is important to consider the way she would respond and react when she is confronted by the police in the hospital several minutes after she just has been through this terrible ordeal. They throw two guns out in front of her, and my recollection of the testimony is that they were both the same color. Officer Wilson's and this other police officer's—

[THE DEFENSE]: Objection.

[THE STATE]: And they said what did it look like, and she pointed the finger at Officer Miller's and she said it looks like that one. And the testimony from Officer Wilson testified this is exactly the same kind of gun he had except it is a darker blue steel. Consider also the lighting in the van, the natural lighting and what it does to different colors of objects."

Contrary to the State's assertion during closing argument, Sergeant Wilson testified that the victim stated that her assailant's gun was different from his gun but she never described the color of the gun. The following colloquy occurred at trial:

"[THE STATE]: Now, in talking to her, did she also describe the weapon that was used in her attack?

[SERGEANT WILSON]: Yes, she did.

[THE STATE]: How did she describe that weapon?

[SERGEANT WILSON]: She described one as a pocket knife or a folding knife, and then she also described a handgun.

[THE STATE]: And how did she describe that handgun to you?

[SERGEANT WILSON]: Myself and Officer Miller were in the quiet room of the hospital, and both of us showed her our weapons. My weapon was a two-inch blue steel detective special. Officer Miller's gun was a four-inch police service revolver.

[THE STATE]: What did she do when she saw your weapon?

[SERGEANT WILSON]: She stated that it was not like mine.

[THE STATE]: And what did she do when she saw Officer Miller's weapon?

[SERGEANT WILSON]: She related that it was like his.

[THE STATE]: Did she ever describe the color of the weapon?

[SERGEANT WILSON]: No, not the color.

[THE STATE]: So she never actually—she never used the words that it was a blue steel handgun?

[THE DEFENSE]: Objection, leading.

[SERGEANT WILSON]: No, she did not.

[THE COURT]: The answer may stand."

In reviewing allegations of prosecutorial misconduct, however, the closing arguments of both the State and the defendant must be examined in their entirety and all alleged improper comments must be placed in their proper context. (*People v. Morgan* (1991), 142 Ill. 2d 410, 453, 568 N.E.2d 755, 770.) Upon examining the statements in question in the context of the State's and defendant's closing arguments, we find that the prosecutor's statements regarding the color of the gun were improper because he misstated the evidence. The trial court then erred in admitting the evidence in question as it failed to rule upon the defendant's objection and it permitted the prosecutor to continue his argument. Improper comments made during closing arguments, however, do not deprive a defendant of a fair trial or constitute reversible error unless they are material (*People v. Stuckey* (1992), 231 Ill. App. 3d 550, 564; see *People v. Cobb* (1989), 186 Ill. App. 3d 898, 914, 542 N.E.2d 1171, 1182-83), *and* they result in substantial prejudice to the accused. (*People v. Stuckey* (1992), 231 Ill. App. 3d 550, 564; see also *People v. Jenkins* (1991), 209 Ill. App. 3d 249, 261, 568 N.E.2d 122, 130; *People v. Williams* (1984), 127 Ill. App. 3d 231, 234, 468 N.E.2d 807, 810.) On the basis of the aforementioned case law, the trial court's inaction does not constitute reversible error because although the question of the color of the gun used by defendant during the victim's abduction is arguably material, defendant was not substantially prejudiced by the misstatement. "[T]he trial court's determination regarding the propriety of [an] argument will not be [overruled] on appeal absent a

clear abuse of discretion." (*People v. Stuckey* (1992), 231 Ill. App. 3d 550, 563; see also *People v. Morrison* (1985), 137 Ill. App. 3d 171, 184, 484 N.E.2d 329, 339-40; *Williams*, 127 Ill. App. 3d at 234, 468 N.E.2d at 810.) Defendant has failed to demonstrate that the trial court clearly abused its discretion in remaining silent subsequent to his objection and in permitting the prosecutor to misstate the evidence.

■ Defendant's final contention concerning statements made during closing argument is that the prosecutor misstated conclusions made by an expert witness concerning the hairs found at the scene of the crime. We agree with defendant that the prosecutor's statements regarding the nature of the hairs found at the scene of the crime were improper because he misstated the evidence, and that the trial court erred in denying defendant's objection to the prosecutor's statements. The defendant, however, was not substantially prejudiced by the misstatements. Statements made during closing argument constituting alleged prejudice to the defendant may be cured if the trial court subsequently instructs the jury that closing arguments are not evidence and that it should disregard any argument not based upon the evidence. (*People v. Graca* (1991), 220 Ill. App. 3d 214, 221, 580 N.E.2d 1328, 1334.) Under the circumstances of the present case, it is plain that the trial court's instructions to the jury cured the error relating to the prosecutor's misstatements regarding the nature of the hairs found at the scene of the crime. Accordingly, we conclude that the prosecutor's statements did not deprive defendant of his sixth or fourteenth amendment rights.

Finally defendant alleges that he did not receive a fair sentencing hearing on the basis that the trial court considered a prison incident report as evidence in aggravation, and because he considered the fact that defendant fathered seven children out of wedlock when he sentenced him.

A trial court's determination of an appropriate sentence for a defendant is entitled to great deference as the trial judge is in the best position to make a sound judgment regarding an appropriate punishment. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 494, 508 N.E.2d 708, 716; *People v. Trimble* (1991), 220 Ill. App. 3d 338, 355, 580 N.E.2d 1209, 1220.) A trial court's sentence will not be disturbed on appeal absent a clear abuse of discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884; *People v. Jenkins* (1991), 209 Ill. App. 3d 249, 263, 568 N.E.2d 122, 132.

■ First, we find that the trial court's consideration of defendant's prior prison incident report as evidence in aggravation was not an abuse of discretion. Defendant maintains that the trial court erred in considering the prison incident report pursuant to *People v.*

*Smith* (1990), 141 Ill. 2d 40, 73, 565 N.E.2d 900, 914. In *Smith*, the Illinois Supreme Court held that prison incident reports are inadmissible at trial under the business records exception to the hearsay rule because such reports "lack the necessary earmarks of trustworthiness and reliability generally attendant to regularly kept business records." (141 Ill. 2d at 73, 565 N.E.2d at 914.) The *Smith* ruling governs the admission of prison incident reports into evidence at trial, but it does not preclude the State from bringing such reports to the attention of a sentencing court as evidence in aggravation. "[I]n determining a sentence a court is not bound by the usual rules of evidence ***." (*People v. Hartzol* (1991), 222 Ill. App. 3d 631, 646, 548 N.E.2d 291, 302.) Hearsay is not inadmissible *per se* at a sentencing hearing on the basis that it encroaches upon a defendant's right to confront a witness. (*People v. Hall* (1986), 114 Ill. 2d 376, 416-17, 499 N.E.2d 1335, 1352; *Hartzol*, 222 Ill. App. 3d at 647, 548 N.E.2d at 303.) Furthermore, evidence of a defendant's prior misconduct in jail is a proper subject of inquiry and may be relevant as an aggravating factor because it could aid the court in its determination of the defendant's propensity toward violence and his potential for rehabilitation. (*Hartzol*, 222 Ill. App. 3d at 647, 548 N.E.2d at 303.) Accordingly, the trial court's consideration of a prison incident report as an aggravating factor during defendant's sentencing hearing was proper and did not constitute an abuse of discretion.

In addition, the trial judge's reference to the fact that defendant fathered seven children out of wedlock did not prejudice defendant. An isolated remark made in passing, even though improper, does not necessarily require that defendant be resentenced. (*People v. Fort* (1992), 229 Ill. App. 3d 336, 340, 592 N.E.2d 1205, 1209.) In the present case, the trial judge's remark did not prejudice defendant.

■ The trial court sentenced defendant within the statutory parameters for the crimes he committed. The sentence for aggravated criminal sexual assault and aggravated kidnapping, both Class X felonies, is a term of imprisonment not less than six years and not more than 30 years. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14, 10—2, 1005—8—1(a)(3).) Defendant's 30-year sentence for aggravated kidnapping fell within statutory guidelines. Defendant qualified for an extended-term sentence for aggravated criminal sexual assault on the basis of his previous convictions for rape, armed robbery and aggravated kidnapping. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2.) A defendant convicted of a Class X felony may be sentenced to an extended term of imprisonment not less than 30 years and not more than 60 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(2).) Defendant's sentence of 60 years' imprisonment was within the

statutory parameters of the minimum and maximum term allowed for an extended-term sentence for Class X felonies. Accordingly, we conclude that the trial court did not abuse its discretion when it sentenced defendant to concurrent terms of 30 and 60 years' imprisonment, respectively, in the Illinois Department of Corrections.

For the above reasons, the judgment is affirmed.

Affirmed.

TULLY and CERDA, JJ., concur.